**UNITED STATES of America**

v.

**Judah Robert LYONS, Appellant.**

No. 82–1839.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 25, 1983.

Decided April 26, 1983.

Joseph Saint-Veltri, Denver, Colo., of the Bar of the Supreme Court of the State of Colorado, *pro hac vice,* by special leave of Court, for appellant.

Daniel E. Toomey, Washington, D.C., and Victor L. Abbo, Boulder, Colo., of the bar of the Supreme Court of the State of Colorado, *pro hac vice,* by special leave of court, were on the brief for appellant. Daniel G. Grove and Carol A. Joffe, Washington, D.C., also entered appearances for appellant.

Thomas P. Murphy, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Michael W. Farrell, John R. Fisher, and Joseph F. McSorley, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before EDWARDS and SCALIA, Circuit Judges, and VAN DUSEN,* Senior Circuit Judge, United States Court of Appeals for the Third Circuit.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

After a trial before the District Court, the appellant was convicted of distribution of and possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1) (1976), and of

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (Supp. V 1981).

carrying a firearm during the commission of a felony, in violation of 18 U.S.C. § 924(c)(2) (Supp. V 1981). He contests his convictions on a variety of grounds. Most of his contentions are meritless.[1] We conclude, however, that the warrantless, post-arrest search of the appellant's hotel room, in the course of which the police discovered a pistol, violated the Fourth Amendment. Admission into evidence of the fruit of that search was therefore improper and the appellant's conviction on the the firearms count must be reversed. Because no evidence relevant to the narcotics count was obtained through the illegal search, the appellant's conviction under section 841(a)(1) is sustained.

## I. BACKGROUND

The pertinent facts may be stated briefly. In March 1982, Detectives Michael Bland and John Centrella were engaged in an undercover investigation of narcotics trafficking in the District of Columbia. With the aid of an informant, they arranged to buy approximately two kilograms of cocaine from the appellant, Judah R. Lyons, who then resided in Colorado. In anticipation of the transaction, Bland and Centrella arranged to rent two rooms in the Georgetown Mews Hotel. Lyons was to stay in Room 209 during his sojourn in town; the police were to occupy Room 214, from where they could conduct visual surveillance of activities in Room 209 and monitor conversations therein, transmitted by a device worn by Centrella.

In the afternoon of March 23, 1982, Lyons arrived in Washington on a flight from Colorado. Soon after his arrival, a key to the room that had been rented on his behalf was given him by a third party (whose identity remains secret); Lyons may have been aware that his benefactor retained a duplicate key. One Timothy Eyerman gave Lyons a ride to the hotel, where Lyons deposited his personal belongings. During the remainder of the afternoon and the morning of the following day, Lyons traveled about the city, dining with Eyerman and later making contact with two accomplices. He spent the night in the room that had been rented for him.

At midday on March 24, Centrella met with Lyons in the lobby of the hotel and the two agreed to "do the deal." They retired to Lyons' room, where, after some preliminary negotiation, Lyons gave Centrella a sample of the cocaine. Centrella then briefly left the room, returning with Bland (posing as a "chemist") and the purchase money. The sale was soon consummated. Immediately afterward, in response to a prearranged signal from Centrella, Detective Dwight Rawls and Sergeant Alfred Boyd entered the room and arrested and handcuffed Lyons.[2]

After his arrest, Lyons briefly "collapsed." He was revived and immobilized, seated on a chair, at a spot "somewhere very close to the door [of the room], either just inside or just outside." Transcript ("Tr.") 114–15. Sergeant Rawls then systematically searched the room, moving "clockwise" around the outside, collecting

---

1. The appellant challenges Count II of his indictment on the ground that it improperly joined charges under 21 U.S.C. § 841(a)(1) (1976) and 18 U.S.C. § 2(a) (1976) (pertaining to aiding and abetting). This argument has two fatal defects. First, the appellant was charged and convicted as a principal; the language in the indictment relating to aiding and abetting was at most harmless surplusage. Second, as the Tenth Circuit has recently held in a persuasive opinion, nothing in the structure of the Comprehensive Drug Abuse Prevention and Control Act of 1970, of which 21 U.S.C. § 841(a)(1) is a part, militates against its use in conjunction with the general provisions of 18 U.S.C. § 2, governing the abetting of the

commission of crimes against the United States. United States v. Cotton, 646 F.2d 430, 432–33 (10th Cir.), cert. denied, 454 U.S. 861, 102 S.Ct. 316, 70 L.Ed.2d 159 (1981).

Because of our disposition of the appellant's Fourth Amendment argument, we need not discuss his other challenges to his conviction on the firearms count.

2. Only Rawls and Boyd are specifically mentioned as members of the arrest team. However, from Rawls' testimony at trial that, at the time of the arrest, there were six officers "on the scene," Tr. 108, we infer that two other policemen soon joined Rawls, Boyd, Centrella, and Bland.

all of Lyons' belongings. In an open closet in the wall adjacent to the wall in which the entrance was located, Rawls found an overcoat that Lyons had been seen wearing or carrying earlier that day. Rawls noticed that one side of the coat was heavy; reaching into the pocket, he discovered a loaded revolver. After recovering these items, Rawls continued around the room and came across a suitcase lying open at the foot of the bed. Inside the suitcase, apparently in plain view, were a shoulder holster, two "speed loaders" (devices for rapidly reloading a revolver), a quantity of ammunition, and various financial records. These materials were added to Rawls' cache.

The police had not obtained a warrant for the search. They did not ask Lyons what he wished done with his belongings, and Lyons did not voice any objection to the collection of his things. It also appears that the police had no intention of giving the coat to Lyons to wear on the way to the station.[3] Rawls later admitted that, at the time of the search, he did not fear for his personal safety. Indeed, he insisted that he was not looking for weapons or contraband. Rather, he claimed that his purpose was to collect all of Lyons' property, so that the police might vacate the premises. He argued that the procedure was mandated by police regulations designed to protect the city from possible civil liability resulting from loss or theft of an arrestee's goods. Tr. 83.

Prior to trial, Lyons moved to suppress the evidence obtained as a result of the search.[4] After a hearing, the District Court denied the motion. The court rejected the Government's argument that Lyons had only a diminished privacy interest in the room [5] but ruled nevertheless "that the police were within their rights when they took the items there." Tr. 166–67. Lyons challenges that judgment.

## II. LEGITIMATE EXPECTATIONS OF PRIVACY UNDER THE FOURTH AMENDMENT

### A. *Introduction*

The Fourth Amendment "protects people from unreasonable government intrusions into their legitimate expectations of privacy." *United States v. Chadwick,* 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977). We begin our analysis, therefore, by determining Lyons' "legitimate expectations" regarding the sanctity of his room and, more specifically, of his closet.

Three principles guide our inquiry. First, "the Fourth Amendment protects people, not places." *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). Thus, the question we must answer is not whether the room and closet were somehow "private spaces" in the abstract, but whether Lyons had a reasonable expectation of privacy therein. *Rakas v. Illinois,* 439 U.S. 128, 139–43, 99 S.Ct. 421, 428–430, 58 L.Ed.2d 387 (1978). Second, a privacy interest, in the constitutional lexicon, consists of a reasonable expectation that uninvited and unauthorized persons will not intrude into a particular area. One may freely admit guests of one's choosing—or be legally obliged to admit specific persons—without sacrificing one's right to expect that a space will remain secure against all others. *Stoner v. California,* 376 U.S. 483, 489–90, 84 S.Ct. 889, 893, 11 L.Ed.2d 856 (1964); *Chapman v. United States,* 365 U.S. 610, 616–17, 81 S.Ct. 776, 779–780, 5 L.Ed.2d 828 (1961). Thus, we must determine, not whether Lyons assumed that he alone had access to Room 209, but whether he reasonably believed

---

**3.** The absence of any such purpose was conceded by the Government at oral argument.

**4.** Lyons seems to have sought suppression of all evidence obtained during the search. But all parties recognize that admission of the unregistered pistol was both necessary and sufficient to establish liability on the firearms count. Thus, we limit our attention, for the purposes of this appeal, to the legality of the seizure of the gun and do not consider whether the suitcase and its contents were legitimately obtained and admitted.

**5.** The trial judge phrased her conclusion as follows: "I don't go with the idea that this was not the defendant's place of abode. It was at the time and I think he had [a] reasonable expectation of privacy in it." Tr. 166.

that the room and the closet were not open to the world at large. Third, an expectation of privacy, strictly speaking, consists of a belief that uninvited people will not intrude *in a particular way.* Such vectorial expectations often expand and contract independently of one another. Thus, a person may renounce his assumption that he is immune from one kind of invasion while retaining his belief that he is protected from others; by exposing oneself to public view, for instance, one does not relinquish one's right not to be overheard. *Katz v. United States,* 389 U.S. at 352, 88 S.Ct. at 511. We must assess the legitimacy, therefore, not of Lyons' expectation that his room and closet were private for all purposes, but of his assumption that the contents of the closet would not be removed and rifled.

 Had Lyons rented his room in the usual fashion, and had the police walked in uninvited, application of the foregoing principles to the instant case would be straightforward and simple. The Supreme Court long ago made clear that "a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures." *Stoner v. California,* 376 U.S. at 490, 84 S.Ct. at 893; *accord Hoffa v. United States,* 385 U.S. 293, 301, 87 S.Ct. 408, 413, 17 L.Ed.2d 374 (1966) (dicta). To be sure, the privacy to which such a hotel guest is entitled is not comparable in *every* respect to that of an owner or tenant of a house. The distinctive attributes of life in a hotel—the facts that the occupants "share corridors, sidewalks, yards, and trees" and that each room abuts several others—inevitably mute some of each guest's legitimate expectations. *United States v. Agapito,* 620 F.2d 324, 331–32 (2d Cir.1980) (quoting

*United States v. Jackson,* 588 F.2d 1046, 1052 (5th Cir.), *cert. denied,* 442 U.S. 941, 99 S.Ct. 2882, 61 L.Ed.2d 310 (1979)), *cert. denied,* 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980). But only those privacy interests affected by the " 'open, public, and shared atmosphere' [of a hotel], together with the 'nearness' and transience of one's neighbors," *id.* at 332, suffer such diminution. Thus, it may be true that "an occupant of a hotel room with connecting doors cannot reasonably assume that his conversations—even those spoken in a normal tone—never will be overheard by others in an adjoining room." *Id.* at 332; *accord United States v. Jackson,* 588 F.2d at 1051–52; *United States v. Burnett,* 493 F.Supp. 948, 952 (N.D.N.Y.1980), *aff'd sub nom. United States v. Cook,* 652 F.2d 55 (2d Cir.), *cert. denied,* 452 U.S. 964, 101 S.Ct. 3115, 69 L.Ed.2d 975 (1981). *But see* Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn.L.Rev. 349, 404–05 (1974). Similarly, a guest may not be entitled to expect that crawl spaces adjacent to his room, which are accessible without entering the room itself, will not be invaded by a stranger. *See Marullo v. United States,* 328 F.2d 361, 363–64 (5th Cir.), *cert. denied,* 379 U.S. 850, 85 S.Ct. 93, 13 L.Ed.2d 53 (1964). But those constrictions of the occupant's interests in no way affect the legitimacy of his expectation that strangers will not invade the room itself and ransack storage areas within it. *See United States v. Irizarry,* 673 F.2d 554, 559–60 (1st Cir.1982); *United States v. Anthon,* 648 F.2d 669, 675–76 (10th Cir.1981) (dicta), *cert. denied,* 454 U.S. 1164, 102 S.Ct. 1039, 71 L.Ed.2d 320 (1982).[6] In sum, had Lyons been an ordinary guest in the Georgetown Mews, the removal and search of his overcoat clearly would have violated his reasonable expectations of privacy.

6. *Cf. United States v. Bulman,* 667 F.2d 1374, 1383–84 (11th Cir.1982) (holding that, for the purpose of evaluating the legality of a warrantless *arrest,* the occupant of a motel room has an expectation of privacy in the room itself equivalent to that of a homeowner in his dwelling), *cert. denied,* 456 U.S. 1010, 102 S.Ct. 2305, 73 L.Ed.2d 1307 (1982).

It has been held that, when deciding whether circumstances are sufficiently "exigent" to justify a warrantless invasion of a hotel room, the

police are entitled to take into account the fact that the occupant is likely to be "transient." *United States v. McKinney,* 477 F.2d 1184, 1186 (D.C.Cir.1973) (per curiam). But that principle has no bearing on the strength of the occupant's privacy interest in his room. *Id.* And, of course, the post-arrest search of Lyons' room cannot be justified on the ground that, if the police had waited for a warrant, the occupant would have been able to flee the jurisdiction.

## B. The Appellant's "Expectation of Privacy" In This Case

The case before us is not quite so simple. Arguably, the unusual circumstances surrounding Lyons' occupancy of the room vitiated his privacy interest therein. Upon critical examination, however, the apparent relevance of each of those circumstances dissipates.

The Government first urges us to take into account the fact that Lyons had not paid for his room. "Centrella had rented Room 209, paid for it with police funds, and registered it in his own name." Under these conditions, the Government insists, Lyons' "expectation of privacy . . . was qualified at best." Brief at 15–16 n. 12.

Much of the apparent force of the Government's argument is lost, however, when one takes into account the limited relevance of legal entitlements when identifying legitimate expectations of privacy. It has long been recognized that rights defined by positive law, though they sometimes figure in the constitutional calculus, do not control it. *United States v. Salvucci,* 448 U.S. 83, 91, 100 S.Ct. 2547, 2552, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois,* 439 U.S. at 143 & n. 12, 99 S.Ct. at 430 & n. 12; *United States v. Jeffers,* 342 U.S. 48, 52–54, 72 S.Ct. 93, 95–96, 96 L.Ed. 59 (1951) (the fact that, by statute, a person can have no "property rights" in contraband does not remove his right to object to its seizure). The crucial factor is whether a person's expectations are founded on "understandings that are recognized and permitted by society." *Rakas v. Illinois,* 439 U.S. at 144 n. 12, 99 S.Ct. at 430 n. 12.[7]

Room 209 had been rented for Lyons by the police, posing as his prospective customers. It is irrelevant whether the room was provided to Lyons as part of his compensation for arranging the sale of the narcotics (as he perhaps thought) or as a means of facilitating a police investigation (as was the case); what matters is that the room had been tendered for his sole use during his stay in the city. As far as his reasonable privacy expectation was concerned, his position was thus comparable to that of an itinerant businessman whose apartment in a foreign city is leased on his behalf by his company, or a sought-after job applicant whose hotel room during the interviewing process is paid for by his prospective employer. Like Lyons, the businessman and applicant lack legally enforceable contractual (or property) rights to their rooms. Yet each regards the space provided for him as his temporary place of abode.

■ The expectation that one's dwelling is secure from invasion by strangers surely is one that society is willing to recognize and respect. "At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 682, 5 L.Ed.2d 734 (1961). Just as the protections due a person ensconced in his dwelling are not diminished by the fact that his residence is temporary, *see Stoner v. California,* 376 U.S. at 490, 84 S.Ct. at 893, so they are not vitiated by the fact that someone other than the dweller is paying the mortgage or rental. Nor can the result be different when the payor is the Government. Assume that, in the situations described above, the businessman's apartment had actually been leased by the police (with the connivance of his company), or the applicant's prospective employer was the District of Columbia. In neither instance could it be argued that the occupant had only a "diminished expectation of privacy" in his place of abode. Lyons' case is no different.

■ We find even less impressive the other unusual circumstance emphasized by the Government. It is said that Lyons likely was aware that the person who gave him the key to the room retained a dupli-

---

**7.** *See also United States v. Taborda,* 635 F.2d 131, 138 (2d Cir.1980) (The decisive issue is whether the zone invaded is one "in which society is prepared, because of its code of values and its notions of custom and civility, to give deference to a manifested expectation of privacy."); 1 W. LaFave, Search and Seizure 230–34 (1978).

cate of it.[8] Lyons' knowledge that someone else had the physical capacity to enter the room in his absence, the Government argues, must at least have reduced his legitimate expectations of privacy. This view fails to take into account the second of the principles described at the outset. The hypothesized fact that Lyons afforded access to the room to one other person—presumably someone he knew and trusted—did not diminish his privacy interest vis-à-vis the rest of the world.[9] To illustrate: it is quite commonplace for a lessor to retain a key to a rented apartment or house; however, the lessor's retention of a limited right of access surely does not nullify or diminish the tenant's reasonable expectations of privacy against uninvited and unauthorized intrusions by other persons.

Finally, it could be argued that, whatever expectations concerning the privacy of the room and closet Lyons *might* legitimately have entertained, he relinquished them when he invited Centrella and Bland into the room. In his oft-cited concurrence explicating the holding in *Katz*, Justice Harlan argued that the establishment of a constitutionally protected privacy interest requires demonstration of two conditions: "first that [the defendant] have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" *Katz v. United States,* 389 U.S. at 361, 88 S.Ct. at 516. Modern doctrine in this area, as the preceding analysis suggests, has concentrated for the most part on the second, "objective" branch of this test. And uneasiness at the prospect of govern-

ment acting in ways that diminish citizens' subjective expectations of privacy and then relying on those diminutions as justifications for encroachments upon their liberties has prompted most commentators and courts to eschew inquiry into defendants' states of mind. *See United States v. White,* 401 U.S. 745, 786, 91 S.Ct. 1122, 1143, 28 L.Ed.2d 453 (1971) (Harlan, J., dissenting) (suggesting considerable retreat from his position in *Katz*); *United States v. Taborda,* 635 F.2d 131, 137 (2d Cir.1980); *United States v. Kim,* 415 F.Supp. 1252, 1256–57 (D.Hawaii 1976).[10] However, the Supreme Court has recently reaffirmed the relevance, at least in some contexts, of a defendant's subjective expectations. *See Smith v. Maryland,* 442 U.S. 735, 740 & n. 5, 99 S.Ct. 2577, 2580 & n. 5, 61 L.Ed.2d 220 (1979). And the case law suggests, at a minimum, that statements or conduct by the defendant *inconsistent* with an expectation of privacy in a given space will operate to neutralize his protected interest therein. *See Rawlings v. Kentucky,* 448 U.S. 98, 105, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois,* 439 U.S. at 152, 99 S.Ct. at 435 (Powell, J., concurring). It might be argued that, by opening his door to the two policemen, Lyons acted in just such a fashion.

■ Brief reflection reveals, however, that Lyons' behavior was in no way inconsistent with a continued expectation of privacy in his room. He clearly believed that Centrella and Bland were the customers he had come to Washington to meet.

**8.** The factual foundation for this assertion is weak. The record reveals only that Centrella gave "the key" or "keys" to an unnamed third party, who then passed one or more keys to Lyons. Tr. 27–31, 72. However, we accept for the sake of argument the Government's claim that Lyons must have presumed that his benefactor retained a key to the room.

**9.** At one point, the Government goes so far as to characterize the informant as a "co-tenant," entitled to consent to a search by the police of premises over which he and Lyons exercised "common authority." *See United States v. Matlock,* 415 U.S. 164, 170–71, 94 S.Ct. 988, 992–993, 39 L.Ed.2d 242 (1974). The Govern-

ment's effort to invoke the "co-occupant" rule fails for two reasons. First, the doctrine enunciated in *Matlock* applies only in circumstances in which there is "mutual use of the property by persons generally having joint access or control for most purposes," 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7; that was manifestly not true in this instance. Second, there is no evidence in the record that the informant ever granted the police the necessary express consent to search the room.

**10.** *See also* W. LaFave, *supra* note 7, at 229–30; Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn.L.Rev. 349, 384 (1974).

He was not opening his room to public view; on the contrary, he was using it as a sanctuary in which to conduct quintessentially "private" business. To be sure, in doing so, he took the risk that Centrella and Bland would turn out to be police officers. Moreover, the fact that the detectives gained admission upon false pretenses in no way impairs the validity, for constitutional purposes, of his consent to their entrance. *Lewis v. United States,* 385 U.S. 206, 210–11, 87 S.Ct. 424, 427, 17 L.Ed.2d 312 (1966).[11] But it is nevertheless apparent that Lyons *intended* to admit only a few persons he assumed were trustworthy.

The foregoing conclusion permits us to disentangle two possible legal effects of Lyons' conduct. By securing Lyons' permission to enter his place of abode, Centrella and Bland acquired constitutional authority to seize all incriminating evidence subsequently given or sold to them, *id.,* or in "plain view" from their vantage point on the premises, *Washington v. Chrisman,* 455 U.S. 1, 5–6, 102 S.Ct. 812, 816, 70 L.Ed.2d 778 (1982). But Lyons did not thereby manifest the absence of a subjective expectation that his room (and his closet) were private. As a result, he did not relinquish his right to object to a subsequent warrantless search of areas the undercover agents had not been invited to examine. *See Lewis v. United States,* 385 U.S. at 211, 87 S.Ct. at 427 (dicta); *Gouled v. United States,* 255 U.S. 298, 306, 41 S.Ct. 261, 263, 65 L.Ed. 647 (1921).

### III. THE LEGALITY OF THE WARRANTLESS, POST-ARREST SEARCH

Having concluded that Lyons possessed a justifiable expectation of privacy in his room and the closet therein, we must consider whether the warrantless, post-arrest search of the coat hanging in his closet complied with the dictates of the Fourth Amendment. Our analysis is shaped by one overarching principle:

[T]he most basic constitutional rule in this area is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." The exceptions are "jealously and carefully drawn," and there must be "a showing by those who seek exemption ... that the exigencies of the situation made that course imperative." "[T]he burden is on those seeking the exemption to show the need for it."

*Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2031–2032, 29 L.Ed.2d 564 (1971) (footnotes omitted). Thus, the seizure of Lyons' gun will "survive constitutional inhibition" only if the Government can show that "the surrounding facts brought it within one of the exceptions to the rule that a search must rest upon a search warrant." *Stoner v. California,* 376 U.S. at 486, 84 S.Ct. at 891 (quoting *Rios v. United States,* 364 U.S. 253, 261, 80 S.Ct. 1431, 1436, 4 L.Ed.2d 1688 (1960)). The Government has advanced two theories in hopes of making such a showing. We conclude, however, that neither of these doctrines is capable of legitimating the activities of the police in this instance; accordingly, we find that the search was unconstitutional and its produce should have been suppressed.

### A. The Inapplicability of the "Search Incident to Arrest" Exception

The Government first seeks to characterize the exploration of Lyons' closet as a "search incident to a lawful arrest." Modern doctrine governing this well-recognized exception to the warrant requirement stems from *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). The Supreme Court there held that, subsequent to a valid arrest, the police may legitimately search the suspect's person and his immedi-

---

**11.** Although the holding in *Lewis* has been criticized, *see, e.g.,* Weinreb, *Generalities of the Fourth Amendment,* 42 U.CHI.L.REV. 47, 67 (1974), its continued vitality is not in doubt. *See United States v. White,* 401 U.S. at 749, 91

S.Ct. at 1124 (plurality opinion) (indicating that the doctrine "remained unaffected by *Katz* "); *United States v. Wright,* 641 F.2d 602, 604–05 (8th Cir.), *cert. denied,* 451 U.S. 1021, 101 S.Ct. 3014, 69 L.Ed.2d 394 (1981).

ate environs. *Id.* at 762–63, 89 S.Ct. at 2039–2040. The scope of the search permitted under this rule is defined by reference to its rationale:

When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area "within his immediate control"—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant. The "adherence to judicial processes" mandated by the Fourth Amendment requires no less.

*Id.* (footnote omitted).

■ The guidelines set forth in the foregoing passages have not been interpreted rigidly. Custodial arrests are often dangerous; the police must act decisively and cannot be expected to make punctilious judgments regarding what is within and what is just beyond the arrestee's grasp. Thus, searches have sometimes been upheld even when hindsight might suggest that the likelihood of the defendant reaching the area in question was slight. *See, e.g., United States v. Mason,* 523 F.2d 1122, 1125–26 (D.C.Cir.1975) (sustaining search of a closet "three or four feet" away from a standing, handcuffed defendant who had attempted to obtain a jacket hanging therein). And it has been held that an arresting officer is not obliged, before searching an arrestee's immediate vicinity, "to calculate the probability that weapons or destructible evidence may be involved." *United States v. Chadwick,* 433 U.S. at 15, 97 S.Ct. at 2485 (dicta). But the touchstone remains the justification articulated in *Chimel.* To determine whether a warrantless search incident to an arrest exceeded constitutional bounds, a court must ask: was the area in question, at the time it was searched,[12] conceivably accessible to the arrestee—assuming that he was neither "an acrobat [nor] a Houdini"? *United States v. Mapp,* 476 F.2d 67, 80 (2d Cir.1973); *accord United States v. Scios,* 590 F.2d 956, 964 n. 15 (D.C.Cir.1978) (en banc); *United States v. Griffith,* 537 F.2d 900, 904 (7th Cir.1976).

■ The search of the closet in the instant case clearly was beyond the pale demarcated by *Chimel* and its progeny. At the time of the search, Lyons was sitting, handcuffed, on a chair near the doorway. Inside the room were six police officers, at least four of whom presumably were armed. The closet was located at the far end of the wall adjacent to that in which the doorway was located—several yards away from Lyons. Under these circumstances, it is inconceivable that Lyons could have gained

12. Though this temporal limitation, like the geographical one, is not applied rigidly, it too is only moderately flexible. Thus, the Supreme Court has held that, "[o]nce law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest." *United States v. Chadwick,* 433 U.S. at 15, 97 S.Ct. at 2485. *See also United States v. Griffith,* 537 F.2d 900, 904 (7th Cir.1976).

access to the area. It is also clear that Lyons never made any attempt to reach the closet, nor did he even request access to it.

The Government might appeal to one of two subsidiary doctrines in an effort to avoid the force of the foregoing reasoning. First, it might argue that Lyons needed the coat to wear on the way to the station house; surely it was reasonable for them to check it for weapons before giving it to him. Assuming without deciding that the police have constitutional authority unilaterally to decide what extra clothing an arrestee needs and then to locate and search those articles,[13] such authority would avail them little in this case; the Government conceded that the police did not anticipate giving—and did not in fact give—the coat to Lyons.

Second, it has been held that, when the police have reason to suspect that confederates of an arrestee are hiding somewhere in the room or house in which (or near which) the arrest takes place and might attempt to liberate their comrade, the police may legitimately search the area more thoroughly than would otherwise be permitted. *See United States v. Irizarry,* 673 F.2d at 558; *United States v. Dien,* 609 F.2d 1038, 1047 (2d Cir.1979) (dicta), *aff'd,* 615 F.2d 10 (2d Cir.1980). Clearly, however, there were no such "exigent circumstances" in this case. The police had been following Lyons' movements for two days, and Centrella and Bland had just spent a significant amount of time in the room with him; the police thus knew to a certainty that Lyons was alone when he was arrested.

In sum, we conclude that this case is controlled by the principle that a warrantless search "remote in time or place from the arrest" is not, for constitutional purposes, a search "incident" to that arrest. *Preston v. United States,* 376 U.S. 364, 367, 84 S.Ct. 881, 883, 11 L.Ed.2d 777 (1964).

### B. *The Inapplicability of the "Inventory Search" Exception*

The second theory advanced by the Government is that the activity that resulted in the discovery of Lyons' gun was not a "search" at all, but rather an "inventory" of his belongings incident to their lawful "impoundment" by the police. The Government insists that such a procedure, designed to protect the arrestee's property rather than to gather information for use in a criminal prosecution, requires no prior judicial approval.

It should be noted, at the outset, that there can be no serious question that the acts of gathering together Lyons' belongings, reducing them to police custody, and inventorying them constituted a "search" within the meaning of the Fourth Amendment. Though the Supreme Court has not specifically so held,[14] it seems indisputable that such a serious invasion of a citizen's expectations of privacy must be governed by the strictures of the Fourth Amendment; the fact that the intrusion was not motivated by a desire to unearth evidence of criminality does not render the Constitution inapplicable. *See United States v. Lawson,* 487 F.2d 468, 472 (8th Cir.1973); 2 W. LaFave, Search and Seizure 564–65 (1978).[15] Nevertheless, war-

---

**13.** For divergent views of the constitutional validity of similar procedures, *compare United States v. Mason,* 523 F.2d at 1126, *with id.* at 1133 (Bazelon, J., dissenting); *United States v. Irizarry,* 673 F.2d at 561 (Aldrich, J., concurring); *United States v. Griffith,* 537 F.2d at 904; *and United States v. Mapp,* 476 F.2d at 81 n. 15.

**14.** In a footnote in *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), a plurality of the Court declined to address this issue, observing that the petitioner had abandoned his contention that "the inventory in this case is exempt from the Fourth

Amendment standard of reasonableness." *Id.* at 370 n. 6, 96 S.Ct. at 3097 n. 6. Justice Powell in his concurrence, *id.* at 377 n. 1, 96 S.Ct. at 3101 n. 1, and Justices Marshall, Brennan, and Stewart in their dissent, *id.* at 385 n. 2, 96 S.Ct. at 3105 n. 2, made clear that they regarded the procedure as a "search."

**15.** *Cf. Terry v. Ohio,* 392 U.S. 1, 18 n. 15, 88 S.Ct. 1868, 1878 n. 15, 20 L.Ed.2d 889 (1968) ("In our view the sounder course is to recognize that the Fourth Amendment governs all intrusions by agents of the public upon personal security . . . ."); *Camara v. Municipal Court,* 387 U.S. 523, 530, 87 S.Ct. 1727, 1731, 18

rantless "inventory searches" have, in some contexts, been held to satisfy the Fourth Amendment standard of "reasonableness." [16] To assess the Government's theory, we must decide whether the considerations that justify the use of such a procedure in other situations are sufficiently implicated by the activities of the police in the instant case to enable their conduct to pass constitutional muster.

The seminal decision in this area is *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). The Supreme Court there upheld an inventory search of a lawfully impounded car. The Court pointed to four factors to support its conclusion that the practice was "reasonable" for constitutional purposes. First, a citizen is entitled to only a "diminished" expectation of privacy in his automobile—"significantly less than that relating to [his] home or office." *Id.* at 367–68, 96 S.Ct. at 3096.[17] Second, inventories of the contents of cars to be kept in police custody promote important public and private interests—"the protection of the owner's property while it re-

mains in police custody; the protection of the police against claims or disputes over lost or stolen property; and the protection of the police from potential danger." *Id.* at 369, 96 S.Ct. at 3097 (citations omitted). Third, in the case before the Court, the owner of the car "was not present to make other arrangements for the safekeeping of his belongings." *Id.* at 375, 96 S.Ct. at 3100.[18] Fourth, the inventory was conducted in accordance with a standard police procedure, "essentially like that followed throughout the country," and there was no evidence that utilization of the procedure was "a pretext concealing an investigatory police motive." *Id.* at 369, 376, 96 S.Ct. at 3097, 3100.

In situations involving similar complexes of concerns, inventory searches of other belongings or containers impounded by the police have been upheld. *See, e.g., United States v. Grill,* 484 F.2d 990, 991–92 (5th Cir.1973) (police may search a suitcase lawfully taken into custody, "to make an inventory of the contents and to see if it contained explosive devices or other materials

L.Ed.2d 930 (1967) ("It is surely anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior.").

**16.** Because inventory searches, by definition, are undertaken for the purpose of cataloging property taken into police custody and not of finding incriminating evidence, the warrant requirement of the Fourth Amendment, designed as it is to secure corroboration by a magistrate of the police's suspicions regarding the existence of evidence of criminality, is simply irrelevant. *See United States v. Chadwick,* 433 U.S. at 10 n. 5, 97 S.Ct. at 2482 n. 5 (dicta); *South Dakota v. Opperman,* 428 U.S. at 370 n. 5, 96 S.Ct. at 3097 n. 5. This is thus one of the few areas in which the meaning of the term "unreasonable" as used in the Amendment is *not* informed by the provision pertaining to warrants. *Cf., e.g., United States v. United States District Court,* 407 U.S. 297, 315, 92 S.Ct. 2125, 2135, 32 L.Ed.2d 752 (1972) ("[T]he definition of 'reasonableness' turns, at least in part, on the more specific commands of the warrant clause."). To determine the legitimacy of inventory searches in various contexts, therefore, reference must be made to factors other than the existence of probable cause or the utility and practicability of subjecting the judgments of the police to the scrutiny of a neutral judicial officer. The factors the Supreme Court has

deemed relevant are discussed in the text at notes 17–18 *infra.*

**17.** The Court also took note of the "inherent mobility of automobiles" as a further justification for allowing them to be searched more readily than homes or offices. *Id.* at 367, 96 S.Ct. at 3096. It acknowledged, however, that the Court had previously accorded cars such differential treatment even when there was "no immediate danger ... that [they] would be removed from the jurisdiction," *id.,* thereby recognizing the crucial importance in the constitutional balance of the diminished expectation of privacy.

**18.** In a footnote, the Court ruled that, under such circumstances, the police need not make affirmative efforts to locate the owner and secure his consent. *Id.* at 376 n. 10, 96 S.Ct. at 3100 n. 10. But it did not consider whether they would be obliged to consult with the owner if he were present at the time of the search. Justice Powell in his concurrence also emphasized the fact that, "[i]n the inventory search context ... [t]he owner or prior occupant of the automobile is not present, nor, in many cases, is there any real likelihood that he could be located within a reasonable period of time." *Id.* at 384, 96 S.Ct. at 3104.

that might pose a danger to the warehouse or other stored items"), *cert. denied,* 416 U.S. 989, 94 S.Ct. 2396, 40 L.Ed.2d 767 (1974); *United States v. Diggs,* 544 F.2d 116, 125 (3d Cir.1976) (en banc) (opinion of Gibbons, J. [which controlled the result in the case]) (federal agents lawfully in possession of a locked box [transferred to them by a gratuitous bailee without the knowledge or consent of the owner] have constitutional authority to make an "inventory search" of its contents), *subsequent disposition aff'd,* 569 F.2d 1264 (3d Cir.1977).

To date, however, no federal court has upheld a warrantless search of a place of abode on the ground that the police had a legitimate interest in inventorying and impounding its contents. Only two cases might, at first glance, appear to support such an extension of the "inventory search" doctrine; upon examination, however, each proves to have involved a search justified by unrelated considerations. In *United States v. Lacey,* 530 F.2d 821 (8th Cir.), *cert. denied,* 429 U.S. 845, 97 S.Ct. 125, 50 L.Ed.2d 115 (1976), the Eighth Circuit ruled that money discovered by the police in the defendant's apartment "was lawfully taken into custody for the sole purpose of safekeeping, since the apartment door could not be secured after it had been forced during entry." *Id.* at 823. But the money had not been discovered initially through an "inventory search," but, rather, through a conced-

edly lawful search undertaken pursuant to a valid warrant. *Id.* Similarly, in *United States v. Lipscomb,* 435 F.2d 795 (5th Cir. 1970), *cert. denied,* 401 U.S. 980, 91 S.Ct. 1213, 28 L.Ed.2d 331 (1971), the Fifth Circuit held (using language superficially pertinent to the instant case) that "it was reasonable for the police officers to take all the arrested couple's personal belongings to headquarters, for the hotel management could not reasonably have been expected to permit those belongings to remain indefinitely in the vacated room." *Id.* at 801. In justifying this conclusion, however, the court stressed the facts that "Deering herself requested that [the belongings] be taken along, and Lipscomb did not offer any objection or suggest any other arrangement for the safekeeping of their possessions." *Id.* In short, collection of Lipscomb's property was justified by the consent of someone who at least appeared to be a co-owner.[19] In the only case in which the Government argued that the need to protect and inventory an arrestee's belongings, without more, justified a search of his hotel room, the contention was rejected out of hand; in *United States v. Griffith,* the Seventh Circuit held that the "inventory search" exemption could not be invoked when the arrestee's belongings were in his "permanent or temporary dwelling." 537 F.2d at 905.[20]

---

**19.** Thus the principle supported by the case is the unsurprising one that the police may inventory and impound personal effects found in a hotel or motel room when the owner requests that they do so. *See United States v. French,* 414 F.Supp. 798, 799–800 (W.D.Okla.1976).

**20.** The few pertinent cases decided by state courts are less consistent and more ambiguous. In *Elson v. State,* 337 So.2d 959 (Fla.1976), the Supreme Court of Florida ruled that the fruits of an inventory search of the defendant's motel room must be suppressed. Reasoning that "[t]here are no facts which can be construed to place any responsibility on the sheriff's department for the care of defendant's property located in the motel room and, thus, making the sheriff's department liable for claims regarding such property," the court held that the "[d]efendant should have been given the choice of leaving his belongings in the motel room or requesting the sheriff to take them into custody for him." *Id.* at 962–63. However, some of the

court's language suggested that "positive evidence that the search was 'inventory' and not 'exploratory'" might lead to a different result. *Id.* at 963. In *State v. Rhodes,* 337 So.2d 207 (La.1976), the Supreme Court of Louisiana upheld an inventory search of the defendant's motel room and introduction into evidence of the fruits thereof. *Id.* at 209. However, the precedential value of the case is limited by the fact that the defendant renounced any privacy interest in the invaded space by insisting that the room was not his and that he had been there "only . . . to pick up some personal property." *Id.* at 208–09. Finally, in *State v. Nelson,* 298 N.C. 573, 260 S.E.2d 629 (1979), *cert. denied,* 446 U.S. 929, 100 S.Ct. 1867, 64 L.Ed.2d 282 (1980), the Supreme Court of North Carolina upheld an inventory search by military authorities of the billets of two soldiers who had been incarcerated by civilian police. 260 S.E.2d at 636–37. The case is readily distinguishable, however, on the ground that the

■ To uphold the application of the "inventory search" theory to the facts of the instant case would thus entail a substantial doctrinal innovation. Taking into account the four factors identified by the Supreme Court as the basis for its decision in *Opperman,* we conclude that such an extension of the theory would be improper.

For the sake of argument, we assume that the second and fourth of the considerations relied upon by the Court in *Opperman* are equally telling in the present context. In other words, we assume that, by collecting and inventorying Lyons' belonging, the police reduced the likelihood that those goods would be lost or stolen, shielded themselves from possible civil liability, and

protected themselves from any inherently dangerous objects that might have been contained in his property.[21] And we accept, *arguendo,* the Government's allegation that the procedure was required by police regulations.[22] We observe, however, that, in terms of the first and third factors, this case differs radically from *Opperman.* We have demonstrated that the space invaded by the police in the course of the "inventory" was Lyons' temporary dwelling—in which he had a legitimate privacy interest equivalent to that of a homeowner in his bedroom. *See* Part II, *supra.* As the Supreme Court has repeatedly noted, citizens' interests in the privacy of their homes may

government, in such a situation, has a special interest in safeguarding *its own* property contained within the soldiers' quarters. *Id.* at 637.

21. A respectable argument could be made that none of the three objectives identified by the Court in *Opperman* was significantly promoted by the collection of Lyons' belongings. First, it is not apparent that Lyons' property would have been vulnerable to vandalism or theft had the police simply vacated the premises and discontinued rental payments (as they were clearly entitled to do). Had the police not assembled his goods, it seems likely that the hotel would have gathered them together and kept them in a storage area until Lyons (soon to be released on bail) redeemed them. It is not self-evident that the belongings were safer in the custody of the police than they would have been in the custody of the hotel.

Second, had the hotel failed to keep track of the goods, it is not at all clear that the police would have been exposed to civil liability for their loss. Certainly it would have been more difficult for Lyons to characterize the police as a "bailee" of his property than it would be for the owner of an impounded automobile. At most, he would be able to cast the police in the role of an "involuntary bailee," whose "duty of care" with respect to conservation of his goods would likely be "slight." *Reeves v. State,* 599 P.2d 727, 736–37 (Alaska 1979); *Mozzetti v. Superior Court,* 4 Cal.3d 699, 94 Cal.Rptr. 412, 484 P.2d 84, 89–91 (1971) (en banc). *But see Christensen v. Hoover,* 643 P.2d 525, 529–30 (Colo.1982) (en banc) (dicta) ("In our view, even a gratuitous bailee must exercise reasonable care to protect the bailor's property . . . ."). Under these circumstances, the police could argue that they satisfied their legal obligation by locking the door behind them as they left Room 209.·

Finally, the police would not appear to be in any way endangered by simply leaving Lyons'

goods in the room. (The relevance of the possible danger to the *public* entailed by such a procedure is considered in note 24 *infra.*)

We raise these considerations in response to certain contentions advanced by the Government. However, in light of our assessment of the first and third of the factors identified in *Opperman,* we find it unnecessary to decide whether the public and private interests served by an inventory search of an impounded car are equally well served by a comparable search of a hotel room.

22. We do not mean to intimate that this issue is free from doubt. At trial, Detective Rawls testified that "the policy of the Police Department" with respect to the belongings of arrestees is that "the recovering officer will seize all of the prisoner's property and then, in turn, turn it over to the station clerk where it is secured." Tr. 83. The Government has acknowledged, however, that this "policy" is both ambiguous and poorly documented. The pertinent department regulations do provide that, "[a]t the time of arrest, a prisoner shall be thoroughly searched and *all* personal property . . . shall be removed" and given to the clerk, who is then responsible for its safekeeping. Metropolitan Police Department General Order, Series 601, No. 1, *Recording, Handling and Disposition of Property Coming into the Custody of the Department* 3, 14–15 (Nov. 30, 1981). Nowhere, however, is it indicated that the arresting officer should conduct an "inventory search" of an arrestee's hotel room. And, on cross-examination, Rawls admitted to some uncertainty regarding the circumstances in which the procedure should and should not be implemented. Tr. 104–06. It is far from clear that this sort of vague, customary departmental "policy" would satisfy the concerns expressed by the Court in *Opperman.*

be overridden only upon a showing of public interests considerably more compelling than those necessary to justify intrusion into automobiles. *Compare, e.g., United States v. Martinez-Fuerte,* 428 U.S. 543, 561, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976), *and Cardwell v. Lewis,* 417 U.S. 583, 590–91, 94 S.Ct. 2464, 2469, 41 L.Ed.2d 325 (1974) (plurality opinion), *with, e.g., Silverman v. United States,* 365 U.S. at 511, 81 S.Ct. at 682, *and McDonald v. United States,* 335 U.S. 451, 455–56, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948). Equally importantly, in this case the owner of the goods was present at the time of the search and easily could have been asked whether he wished the police to collect them or whether he wanted to make other arrangements for their safekeeping.[23]

The foregoing differences between *Opperman* and the instant case seem to us decisive. We conclude that, given the importance of the privacy interests at stake, the failure of the police to consult with Lyons before assembling and searching his belongings was inconsistent with their constitutional obligations.[24]

**CONCLUSION**

For the foregoing reasons, we find that the search of the pockets of the overcoat hanging in the closet impinged upon Lyons' legitimate expectations of privacy and was not justified by any exception to the warrant requirement. Consequently, Lyons' pistol was obtained through a procedure that violated his rights under the Fourth Amendment. The District Court, therefore, should have excluded the gun from the evidence in the case. Its failure to do so requires reversal of Lyons' conviction on the firearms count.

We hereby vacate the appellant's conviction on the firearms count, affirm his conviction on the narcotics count, and remand for reconsideration of the sentence imposed.[25]

*So ordered.*

**23.** Most courts presented with the issue have concluded that a warrantless inventory search of an impounded *automobile* is unconstitutional if the owner is present and is not consulted. *See United States v. Wilson,* 636 F.2d 1161, 1165 (8th Cir.1980) (alternative holding); *State v. Killcrease,* 379 So.2d 737, 739 (La.1980); *State v. Mangold,* 82 N.J. 575, 414 A.2d 1312, 1317–18 (1980); *State v. Goff,* 272 S.E.2d 457, 460 (W.Va.1980) (dicta). *But see United States v. Edwards,* 577 F.2d 883, 894 n. 23 (5th Cir.) (en banc) (per curiam) (alternative holding), *cert. denied,* 439 U.S. 968, 99 S.Ct. 458, 58 L.Ed.2d 427 (1978); *People v. Clark,* 65 Ill.2d 169, 2 Ill.Dec. 578, 580, 357 N.E.2d 798, 800 (1976), *cert. denied,* 431 U.S. 918, 97 S.Ct. 2184, 53 L.Ed.2d 229 (1977). Clearly, the duty of the police to ascertain an owner's desires is even stronger when they contemplate ransacking his dwelling.

**24.** In reaching this conclusion we note, also, that the Government has made no allegation that, *prior* to the search of the closet, the police had any reason to suspect that Lyons was carrying a gun. During their surveillance of his movements before his arrest, they never observed a firearm in his possession. And only after Detective Rawls had removed the overcoat from the closet and found the pistol did he discover the suitcase containing the ammuni-

tion and speed loaders. In sum, the Government did not show (or even argue) that, at the time of the crucial aspect of the search, the police had any grounds for believing that leaving Lyons' belongings in his room would endanger the public safety. Under these circumstances, we find inapposite the doctrine enunciated in cases like *Cady v. Dombrowski,* 413 U.S. 433, 447–48, 93 S.Ct. 2523, 2530–2531, 37 L.Ed.2d 706 (1973) (holding that, when the police have reason to believe that a disabled or impounded automobile contains a gun that, if not secured, might fall into the hands of a thief or vandal, they may search the car in an effort to retrieve it).

**25.** Where, as here, we cannot ascertain whether the District Court's sentence on a valid conviction was influenced by a conviction on a separate count that is later overturned on appeal, the proper course is to remand so that the District Court may reconsider the sentence imposed. *E.g., United States v. Pinkney,* 551 F.2d 1241, 1246 & n. 37 (D.C.Cir.1976); *United States v. Moore,* 540 F.2d 1088, 1091 (D.C.Cir. 1976); *United States v. Diggs,* 522 F.2d 1310, 1324 (D.C.Cir.1975), *cert. denied,* 429 U.S. 852, 97 S.Ct. 144, 50 L.Ed.2d 127 (1976); *Bryant v. United States,* 417 F.2d 555, 558 (D.C.Cir.1969).