**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 24 2001**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ORLANDO GILL,

Defendant-Appellant.

No. 00-1522

(D. Colo.)

(D.C. No. 99-CR-395)

---

**ORDER AND JUDGMENT** *

---

Before **HENRY** , **BRISCOE** , and **MURPHY** , Circuit Judges.

---

After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for decision on the briefs without oral argument. See Fed. R. App. P. 34(f). The case is therefore submitted without oral argument.

Orlando Gill was charged with one count of making counterfeit United States currency, a violation of 18 U.S.C. § 471, and one count of possessing

---

\* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

electronic equipment used for the production of counterfeit currency, a violation of 18 U.S.C. § 474. During the proceedings below, Mr. Gill filed a motion to suppress the evidence of counterfeiting seized from his motel room. The district court denied the motion, after which Mr. Gill pleaded guilty to the first count of the indictment. The guilty plea, however, included a provision reserving Mr. Gill's right to appeal the denial of the motion to suppress. Mr. Gill now appeals on that basis, and, for the reasons stated below, we affirm.

I.

On July 21, 1999, Donna Boatwright and Dinah Lee Shaw were working at the Suburban Lodge, a motel located in Aurora, Colorado. Ms. Boatwright was the general manager of the motel, and Ms. Shaw a front desk clerk. Mr. Gill was a guest at the Suburban, but his occupancy was due to expire at 11:00 a.m. that day.[1] Some time after 11:00 a.m., Mr. Gill went to the front desk of the motel and told Ms. Boatwright and Ms. Shaw that his electronic room key was not working. The employees informed Mr. Gill that his key had expired at 11:00 a.m. because he had not paid for his room for that day. Mr. Gill replied that "he needed his key to be renewed so that he could go up to his room to get money to pay for the rest

---

[1] The record indicates that Mr. Gill had been a guest at the Suburban for approximately two weeks. See Rec. vol. II, doc. 57, at 23 [hereinafter Tr.] (suppression hearing testimony of Ms. Shaw, July 7, 2000) .

of his stay." Tr. at 5 (suppression hearing testimony of Ms. Shaw, July 7, 2000). Consequently, Ms. Boatwright remade Mr. Gill's key. The purpose of remaking the key was "so [that Mr. Gill] could go up to his room *immediately* and . . . get the room rent to bring it back down so [the employees] could renew his keys for the length of time he was going to stay." Id. (emphasis added); see also id. at 6 ("He was supposed to come back *right away* with the rent money . . . .") (emphasis added).

After Ms. Boatwright reissued the key, Mr. Gill walked off in the direction of his room. "Right after that," Ms. Boatwright and Ms. Shaw "noticed that there was a package that had been sitting there for about four or five days" for Mr. Gill. See id. at 7. The employees waited for Mr. Gill's supposed immediate return, but after fifteen or twenty minutes he still did not appear, thus prompting Ms. Boatwright to telephone him in his room. Upon getting no response, Ms. Boatwright decided to take the package to Mr. Gill's room. According to Ms. Shaw, Ms. Boatwright was concerned in part that Mr. Gill might "book" on the motel – i.e., leave without paying the rent. See id.

When Ms. Boatwright reached Mr. Gill's room, Room 224, she knocked on the door three times and said, "Front desk." After receiving no response, Ms. Boatwright used her general manager key to open the door. When Ms. Boatwright opened the door, she saw that counterfeit money was being produced by a copier

in the room. Ms. Boatwright thereafter returned to the front desk, contacted the police, and disenabled the key she had given to Mr. Gill earlier.

In response to Ms. Boatwright's call, two police officers were dispatched to the Suburban: Officer Donald Poor and Officer Walt Martin. When Officer Poor arrived at the motel at approximately 1:35 or 1:45 p.m., Officer Martin was already at the scene and had spoken to Ms. Boatwright. Officer Martin told Officer Poor that, according to Ms. Boatwright, Mr. Gill was in the room. Officer Poor and Officer Martin then went to Room 224, which is located on the second floor.

The officers knocked on the door, announcing that they were with the police department, but received no response. Officer Martin looked through the peephole and said that he saw movement in the room. Both officers then put their ears to the door and heard what Officer Poor described as a rustling or gathering noise. See id. at 27 (suppression hearing testimony of Officer Poor, July 7, 2000). According to Officer Poor, "with that rustling noise, I assumed that someone was maybe going to destroy" the evidence that Ms. Boatwright said was in the room. Id. at 28.

Consequently, Officer Martin tried to open the door of Room 224 with a key, which presumably he had been given by Ms. Boatwright. See id. at 39 (suppression hearing testimony of Officer Poor, July 7, 2000) ( "I don't know

when Officer Martin got the pass key. I don't remember him getting it at the door [of Room 224]. He may have got it prior to going up to the room."). The door did not open up completely because of a safety lock, but, by this time, Ms. Boatwright had followed the officers to Room 224 and she explained to them how to "defeat the [door] lock," id. which would allow the door to swing all the way open.

With Ms. Boatwright's assistance, the officers successfully overcame the safety lock and, upon entering the room, they conducted a cursory search of the room – according to Officer Poor, "[f]or safety reasons." Id. at 30. During this search, the officers saw evidence of criminal activity, including "sheets of paper laying around that had $50 images on them," id. at 29, and a copier printing counterfeit currency. Subsequently, federal authorities were contacted regarding the evidence.

## II.

On July 7, 2000, a suppression hearing was held, during which Mr. Gill contested the admissibility of the various evidence seized from his motel room on the basis of the Fourth Amendment. The district court denied Mr. Gill's motion to suppress on several grounds. First, it concluded that Mr. Gill had no standing to allege a Fourth Amendment violation because his tenancy was terminated prior

to the arrival of the officers at the Suburban – once, when Mr. Gill did not pay the rent at 11:00 a.m., and a second time, when Ms. Boatwright disenabled Mr. Gill's key after witnessing the evidence of counterfeiting in his room. Second, the district court suggested that, even if Mr. Gill did have standing, there was no Fourth Amendment violation because there were exigent circumstances – namely, the removal or destruction of evidence – justifying the warrantless search by the officers.

The district court, however, expressed its concern that this was "a close issue." Id. at 76. According to the district court, "without . . . the addition of the consent of the person in control [i.e., Ms. Boatwright], I don't know whether I would rule the same way." Id. Because of its concern, the district court limited its denial of the motion to suppress to the evidence "in plain view upon entry of the front door." Id.

III.

On appeal, Mr. Gill raises two arguments: (1) that the district court erred in determining that he lacked standing to challenge the search of his room at the Suburban and (2) that the district court erred in concluding that there were exigent circumstances justifying the search of his room without a warrant.

In reviewing a ruling on a motion to suppress, we accept the district court's factual findings unless they are clearly erroneous. We

> view the evidence in the light most favorable to the prevailing party. However, the ultimate determination of whether the challenged conduct is reasonable under the Fourth Amendment is a legal question that we examine de novo. Whether a defendant has standing to challenge a search is also a legal question subject to de novo review.

United States v. Elycio-Montoya, 70 F.3d 1158, 1161 (10th Cir. 1995) (citations omitted).

We address first the standing argument. In determining whether a defendant has standing in the Fourth Amendment context, we ask first "whether the defendant manifested a subjective expectation of privacy in the area searched and [second] whether society is prepared to recognize that expectation as objectively reasonable." United States v. Allen, 235 F.3d 482, 489 (10th Cir. 2000) (internal quotation marks omitted).

Mr. Gill contends that, at the time of the search, he had a subjective expectation of privacy in his room at the Suburban as demonstrated by two facts: (1) that "the door [to the room] was locked" and (2) that "his belongings were still in the room." Aplt's Br. at 10-11. He then asserts that his expectation of privacy in the room was reasonable because the Suburban employees had extended his rental period at the motel beyond the 11:00 a.m. checkout time on July 21, 1999. According to Mr. Gill, the following facts confirmed this extension: (1) that Ms. Boatwright renewed his key after the checkout time and gave him permission to pay the rent at a later time, (2) that Ms. Boatwright

-7-

delivered a package to his room after the checkout time, and (3) that the motel used part of his security deposit of $99.00 to cover the rent for July 21, 1999. In support of his position, Mr. Gill relies primarily on United States v. Owens, 782 F.2d 146 (10th Cir. 1986), and United States v. Watson, 783 F. Supp. 258 (E.D. Va. 1992).

For purposes of this opinion, we need not decide whether or not Mr. Gill had a subjective expectation of privacy at the time of the search because, even if he did, that expectation was not reasonable. Cf. United States v. Lyons, 706 F.2d 321, 328 (D.C. Cir. 1983) (noting that "[m]odern doctrine in this area . . . has concentrated for the most part on the . . . 'objective' branch of this test"). In arriving at this conclusion, we begin with the general rule that "a defendant's expectation of privacy in a [m]otel room expires at checkout time" but that "the policies and practices of a [m]otel may result in the extension past checkout time of a defendant's reasonable expectation of privacy." United States v. Dorais, 241 F.3d 1124, 1129 (9th Cir. 2001); see also Owens, 782 F.2d at 150 (concluding that the defendant had a reasonable expectation of privacy past the checkout time in part because, a few days earlier, he "had remained in his room past check-out time without consequence").

In the instant case, we conclude that the Suburban did have a policy or practice that extended Mr. Gill's reasonable expectation of privacy beyond the

-8-

11:00 a.m. checkout time. Ms. Shaw testified at the suppression hearing that "it's really normal that a lot of guests forget about their keys expiring at 11:00 a.m., so it's not abnormal to make a key for the guest to go up to room to pay." Tr. at 7 (suppression hearing testimony of Ms. Shaw, June 7, 2000). However, we also conclude that the duration of that expectation was extremely limited under the circumstances. See Dorais, 241 F.3d at 1129 ("The existence and duration of that expectation depend on the facts and circumstances in each case."). As Ms. Shaw testified, the understanding between the Suburban employees and Mr. Gill that Mr. Gill would return *immediately* to the front desk with the money to pay for rent. Nothing in the record controverts this fact.

Because of this understanding, it was not reasonable for Mr. Gill to maintain any expectation of privacy in his room beyond the time necessary to go to his room and come back with the rent money. Cf. United States v. Singleton, 922 F. Supp. 1522, 1529 (D. Kan. 1996) ("Having failed to pay the rent for another night within the time given by [the manager], [the defendant] could not have had a legitimate expectation of privacy in the room simply because she . . . remained in possession of it."); State v. Mitchell, 20 S.W.3d 546, 559 (Mo. Ct. App. 2000) ("[T]he record nowhere suggests that he asked for permission to stay a second night or that he was granted an indefinite or lengthy extension of the prior night's rental."). Exactly how much time Mr. Gill had to return to the front

desk is not important.  It is enough that we know (1) that his immediate return was required and (2) that the search did not take place – at the very least – until more than fifteen to twenty minutes later.  See Tr. at 7 (suppression hearing testimony of Ms. Shaw, June 7, 2000) (stating that Ms. Boatwright "waited at least 15, 20 minutes" for Mr. Gill, that Ms. Boatwright thereafter went to Mr. Gill's room where she saw evidence of counterfeiting, that Ms. Boatwright subsequently contacted the police).  By this time, the extension of Mr. Gill's reasonable expectation of privacy had certainly lapsed.[2]

Mr. Gill suggests, however, that the motel's withholding of his security deposit demonstrates that his rental period was actually extended for a full day. We remain unconvinced.  As the district court noted, "because of the defendant's

---

[2]  Because of this conclusion, we need not discuss whether Mr. Gill also lacked a reasonable expectation of privacy as a result of Ms. Boatwright's disenabling his key.  See United States v. Allen, 106 F.3d 695, 699 (6th Cir. 1997) ("Upon learning that [the defendant] was keeping contraband within the motel, the motel manager locked [him] out of his room.  With this action, the motel manager divested [the defendant] of his status as an occupant of the room, and concomitantly terminated his privacy interest in its contents."); State v. Loya, 18 P.3d 1116, 1121 (Utah Ct. App. 2001) ("A defendant may still have possession of or access to the room, but if check out time has passed and management is attempting to exercise control over the room, defendant no longer has a reasonable expectation of privacy in the room."); cf. United States v. Haddad, 558 F.2d 968, 975 (9th Cir. 1977) ("[The defendant] had no reasonable expectation of privacy with respect to a room from which he had been justifiably ejected. Whether his checking out was voluntary is irrelevant.  Once ejected for good cause, the room reverted to the control of management, and the former occupant had no continuing right to privacy in the room.").

activities the [motel] did not have full access or could not rent the premises for that day. And it would logically be appropriate to charge the security deposit that amount." Tr. at 75 (suppression hearing, July 7, 2000); see also id. at 17 (suppression hearing testimony of Mr. Shaw, July 7, 2000) ("We have guests that come in that would like to use the $99 towards room rent which we do not allow. . . . We didn't use [the security deposit] towards room rent at all. We used it towards room rent *after* we checked the guests out . . . .").

IV.

Because Mr. Gill did not have standing, we do not address the secondary issue of whether the warrantless search conducted by the officers violated the Fourth Amendment. Accordingly, the judgment of the district court is AFFIRMED.

Entered for the Court,


Robert H. Henry
Circuit Judge