UNITED STATES of America,
Plaintiff–Appellee,

v.

Ellery QUEEN, Defendant–Appellant.

No. 87–1986.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 5, 1988.

Decided May 16, 1988.

evidence discovered pursuant to that arrest. The court had issued a bench warrant for Mr. Queen's arrest when he failed to surrender himself voluntarily for execution of sentence on prior offenses. Pursuant to the bench warrant, agents of the Federal Bureau of Investigation (FBI) arrested Mr. Queen at his residence. At that time, the agents discovered a loaded revolver on the floor of the closet where Mr. Queen was arrested. Mr. Queen subsequently was indicted for several offenses related to the arrest and his post-arrest conduct. After his pretrial motions were denied, Mr. Queen pleaded guilty to two counts of the indictment and the district court imposed sentence. Because both the arrest and the search incident to the arrest were lawful, we affirm the judgment of the district court.

## I

### Background

#### A. *Earlier Criminal Proceedings*

In a verdict rendered on January 14, 1983, a jury found Mr. Queen guilty of conspiracy and interstate transportation of stolen property. On February 24, 1983, the district court sentenced him to ten-years imprisonment with a consecutive five-year probation term. The sentence was stayed pending appeal. Mr. Queen then appealed to this court. However, we dismissed his appeal in a mandate issued February 14, 1984 for failure to file a brief.[1] On June 13, 1984, pursuant to a motion under Rule 35 of the Federal Rules of Criminal Procedure, the district court reduced his sentence to eighteen months. At that time, the court also set July 13, 1984 as Mr. Queen's surrender date. Mr. Queen failed to surrender himself on that date.

Nearly four months after his surrender date, on November 5, 1984, the government obtained a bench warrant for Mr. Queen's

Debra Rae Bernard, Miquelon & Associates, Ltd., Chicago, Ill., for defendant-appellant.

Jeffrey E. Stone, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, FLAUM and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

The defendant, Ellery Queen, appeals a ruling of the district court denying his motion to quash his arrest and to suppress

---

1. After the appeal was dismissed, Mr. Queen filed a motion on May 18, 1984, to reinstate the appeal, recall the mandate, and to grant leave to defendant to file his brief & appendix instanter. We denied the motion in an order dated May 30, 1984. Nevertheless, Mr. Queen subsequently did file a brief. However, the brief "was not accepted by the Court of Appeals." Tr. of June 13, 1984 at 4; *see* R.35 at 3 ("[T]he Appellate Court chose not to accept Defendant's brief which was submitted by Mr. Broussard after the appeal was dismissed.").

arrest. On January 15, 1985, three FBI agents arrested Mr. Queen at his home. After the arrest, the agents discovered a loaded handgun. Then, while being transported to the federal building, Mr. Queen raged that he wanted to kill one of the agents—Agent Daniel R. Dzwilewski, who had testified against Mr. Queen at his conspiracy trial—and that he had embarked on a plan to kill the agent.

On January 21, 1985, the Supreme Court issued its decision in *Evitts v. Lucey,* 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). On the basis of that decision,[2] Mr. Queen moved to reinstate his appeal on April 5, 1985. In an order dated April 19, 1985, we granted the motion, recalled our February 14, 1984 mandate, and reinstated Mr. Queen's appeal. We subsequently issued a per curiam order affirming Mr. Queen's conviction. In March 1986, Mr. Queen finished serving his eighteen-months imprisonment on the 1983 conviction.

While Mr. Queen was serving his eighteen-month sentence, the government petitioned the district court to revoke his probation on the basis of his failure to surrender and his conduct during the apprehension. This petition was filed in February 1985 but withdrawn on May 21, 1986.[3]

## B. *The Present Criminal Action*

In February 1987, an indictment was returned charging Mr. Queen with five counts stemming from the events on the day he was arrested pursuant to the bench warrant: 1) failing to surrender himself for execution of a previous sentence; 2) being a convicted felon in the possession of a firearm that moved through interstate commerce; 3) using a deadly weapon to assault and resist federal agents in the performance of their duties; 4) attempting to cause injury to a federal agent in retaliation for his testimony at a prior trial; and 5) possessing a firearm while committing the crimes charged in counts three and four. The government moved for the detention of Mr. Queen and the court granted the motion on February 24, 1987.

A hearing was held to consider a motion to quash the arrest, to suppress any physical evidence seized and to suppress any oral statements that Mr. Queen made to the agents. The district court denied the motion on April 7, 1987. Thereafter, on April 20, 1987, Mr. Queen entered a conditional plea of guilty to two counts: failure to surrender and being a felon in possession of a firearm. On June 15, 1987, the district court sentenced him to five-years probation on each count. The sentences were to run concurrently with each other and with the probation imposed from the initial 1983 conspiracy conviction. At that time, the government moved to dismiss the three remaining counts of the indictment. Mr. Queen then timely filed a notice of appeal.

## C. *Facts Surrounding the Arrest*

Because Mr. Queen's arguments on appeal turn on the events surrounding his arrest in 1985, a more detailed presentation of those facts is required.

---

**2.** In *Evitts v. Lucey,* 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985), the Supreme Court held that the due process clause of the fourteenth amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right. The Court thus affirmed the lower court's holding that the failure of the defendant's attorney to perfect an appeal as of right deprived him of the effective assistance of counsel.

**3.** The government's representation to the district court was as follows:

In light of the court's oral suggestion that the government seriously consider a separate prosecution for the allegations contained in the government's Petition to Revoke Proba-

tion, it is the government's position that its resources can best be utilized in a separate prosecution. Therefore, the government respectfully requests that the court grant the government's motion to dismiss its previously filed Motion to Revoke Probation.

R.141. We note that, shortly before the filing of the motion, this court had rendered its opinion in *United States v. Dick,* 773 F.2d 937 (7th Cir. 1985), which held that acts committed before a probationary period commenced could not form the basis for revocation of probation. (That holding was subsequently overruled in *United States v. Yancey,* 827 F.2d 83 (7th Cir. 1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1239, 99 L.Ed.2d 437 (1988)).

On January 15, 1985, at approximately 7:10 a.m., three FBI agents, Thomas Canady, John Dolan and Daniel R. Dzwilewski, went to Mr. Queen's residence in Northbrook, Illinois to execute the bench warrant for his arrest. The agents covered both the front and rear doors of the house. Although nobody answered the doorbell, Agent Dolan saw a man through a glass partition in the door. He then testified that the man moved behind an interior door of the house. For several minutes, the agents continued to knock and ring the bell. Yet, despite their announcing themselves as federal agents, the man inside denied them entry.

Shortly thereafter, Nona Queen, Mr. Queen's wife, arrived at the residence in her automobile, but drove off when she observed the agents. An agent followed and eventually stopped her. When questioned concerning Mr. Queen's whereabouts, she responded that he had left for California in July 1984. The agents then returned to the Queen residence. At 8:51 a.m., Mr. Queen's stepson, Michael Freese, drove up to the Queen residence. Mr. Freese refused to talk to the agents and entered the house. He departed the residence shortly thereafter. Agent Dolan then questioned some neighbors; one indicated that he had seen Mr. Queen only two weeks before.

At approximately 10:15 a.m., Mr. Freese returned to the Queen residence where the agents were continuing their surveillance. They informed Mr. Freese that they had a warrant for Mr. Queen's arrest. At this point, the agents followed Mr. Freese into the house.[4] Once inside, the agents called out for Mr. Queen and announced that they had an arrest warrant. When they received no response, the agents searched the house.

Agent Dolan eventually went to the basement and searched a closet. The closet was approximately three-feet deep by three-feet wide with a crawl space on the left side. Upon entering the closet, the agent moved some clothes and observed a blanket on the floor. Agent Dolan felt the blanket and immediately determined that someone was underneath it. The agent drew his gun and ordered the person to "[p]ut your hands out, palms up." Tr. of Apr. 7, 1987 at 21. There was no response from the person underneath the blanket. Agent Dolan then repeated the command. His call alerted Agents Dzwilewski and Canady, who proceeded to the basement. Mr. Queen, the person hiding underneath the blanket, then moved only one hand into the open. Agent Dolan then commanded Mr. Queen to "[p]ut the other hand out." *Id.* at 22. However, Mr. Queen refused to do so. After several seconds had elapsed, Agent Dolan made another command to expose the other hand. Mr. Queen finally complied.

Mr. Queen then was commanded to exit the closet. With Agent Dolan's handgun trained on him, Agents Dzwilewski and Canady patted Mr. Queen down and handcuffed him in an area approximately three feet from the open closet. Immediately thereafter, Agent Dolan returned to the closet and looked down at the spot where the blanket had concealed Mr. Queen. On the floor of the closet, unobstructed by the blanket,[5] was a .357 magnum revolver load-

---

4. At trial, it was disputed whether the agents obtained Mr. Freese's consent. The issue is not raised on appeal.

5. At the detention hearing, Agent Dzwilewski testified that Agent Dolan retrieved the revolver from underneath the blanket. Tr. of Feb. 24, 1987 at 20. At the subsequent suppression hearing, Agent Dzwilewski contradicted his prior testimony. At that hearing, he testified that he did not observe Agent Dolan recover the gun from underneath the blanket. Tr. of Apr. 7, 1987 at 75. The district judge strongly admonished Agent Dzwilewski and the government for this inconsistency. However, Agent Dolan testified that the gun was not obstructed by the blanket and he saw it merely by looking at the floor of the closet. *Id.* at 26. The court ruled solely on Agent Dolan's testimony that the blanket was not moved to find the gun. *Id.* at 108–11. As we previously have noted, the factual findings in a suppression hearing are binding on us unless clearly erroneous. *United States v. Oglesby*, 764 F.2d 1273, 1278 (7th Cir.1985); *United States v. Streich*, 759 F.2d 579, 585 (7th Cir.), *cert. denied*, 474 U.S. 860, 106 S.Ct. 172, 88 L.Ed.2d 142 (1985); *accord United States v. Skowronski*, 827 F.2d 1414, 1417 (10th Cir.1987).

ed with two hollow-point bullets—which expand upon impact—and four standard bullets. Agent Dolan seized the firearm and Mr. Queen was transported to the federal building. On his way there, Mr. Queen uttered excited comments threatening the life of Agent Dzwilewski. At a suppression hearing conducted to determine whether the search of the closet violated the fourth amendment, the district court held that the search was lawful incident to Mr. Queen's arrest.

## II

### Discussion

**A.** *Jurisdiction of the District Court to Issue Bench Warrant*

Mr. Queen contends that, because our April 19, 1985 order recalled our February 14, 1984 dismissal of his appeal, his original appeal was pending before us ever since it was initially filed in February 1983. Accordingly, he contends, the district court had no jurisdiction to issue the November 5, 1984 bench warrant for his arrest. The government, in contrast, contends that the district court retains limited jurisdiction to enforce its own orders.

 Once an appeal has been taken, the general rule is that a district court—with limited exceptions—is powerless to take any adjudicatory action related to the appeal. *United States v. Distasio*, 820 F.2d 20, 23 (1st Cir.1987); *Doyle v. United States*, 721 F.2d 1195, 1197 (9th Cir.1983); *see also Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58, 103 S.Ct.

400, 401, 74 L.Ed.2d 225 (1982) (per curiam). Nevertheless, district courts do retain limited jurisdiction to take certain post-appeal actions in criminal cases. See *United States v. Katsougrakis*, 715 F.2d 769, 776 n. 7 (2d Cir.1983), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984); *see also* 18 U.S.C. § 3148 (district court has jurisdiction to impose sanctions for violation of a post-conviction release condition); Fed.R.Crim.P. 36 (district court has jurisdiction to correct clerical errors in record). One such limited jurisdiction exception is that a district court may enforce its own judgment concerning a defendant's release status. *United States v. Drefke*, 707 F.2d 978, 984 (8th Cir.) (per curiam), *cert. denied,* 464 U.S. 942, 104 S.Ct. 359, 78 L.Ed. 2d 321 (1983); *United States v. Elkins*, 683 F.2d 143, 145 (6th Cir.1982) (quoting *United States v. Black*, 543 F.2d 35, 37 (7th Cir.1976)); *United States v. Bowdach*, 561 F.2d 1160, 1167 (5th Cir.1977).

Here, after sentencing Mr. Queen on his 1983 conviction, the district court stayed the sentence pending appeal.[6] A decision to stay the sentence pending appeal is governed by Rule 46(c) of the Federal Rules of Criminal Procedure which states that "[e]ligibility for release pending sentence or pending notice of appeal ... shall be in accordance with 18 U.S.C. § 3143." Section 3143 provides that a person convicted of an offense must be detained "unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released

---

**6.** The district court stayed the sentence on three occasions pending Mr. Queen's appeal of separate and distinct judicial decisions. At the 1983 sentencing hearing, the district court stayed the original sentence for 14 days pending Mr. Queen's decision to file an appeal with this court. At that time, the court also informed Mr. Queen that he would have four months to file a motion to reduce sentence pursuant to Rule 35 of the Federal Rules of Criminal Procedure. Mr. Queen did file a notice of appeal on February 25, 1984, which, as already noted, was dismissed for failure to prosecute the appeal. Subsequently, the government made an oral motion to order a surrender date for Mr. Queen. On April 6, 1984, the district court granted the government's motion and ordered Mr. Queen to

surrender himself to a federal marshal on or before May 31, 1984. However, on May 18, 1984, Mr. Queen moved to continue the stay of execution of sentence pending a motion to reinstate the dismissed appeal before this court. The district court granted the motion on May 30, 1984. On June 7, 1984, Mr. Queen filed his Rule 35 motion to reduce sentence. The district court, in an order dated June 13, 1984, granted the motion and stayed execution of the sentence until July 13, 1984. The court granted the stay, at least in part, to permit Mr. Queen "to file a motion to vacate [his] conviction, judgment and sentence upon the ground, among other things, that [he] w[as] not provided with the effective assistance of counsel." Tr. of June 13, 1984 at 15.

pursuant to section 3142(b) or (c)."[7] The district court has the authority to revoke such a release if the defendant violates the order. *See* 18 U.S.C. § 3148(a). Here, the condition of Mr. Queen's continued release pending appeal was to surrender himself voluntarily on July 13, 1984.

We previously have confronted this situation. In *United States v. Black,* 543 F.2d 35 (7th Cir.1976), the defendant was released on bond pending an appeal of his conviction for knowingly making a false statement in a loan application. Subsequently, this court affirmed the conviction and the district court revoked the bond and ordered the defendant to surrender himself to commence serving his sentence. The defendant refused to surrender. The government then charged him with the offense of willful failure to surrender. On appeal of his conviction for that offense, the defendant contended that the district court lacked jurisdiction to order him to surrender while his appeal was pending (the clerk of the district court had not yet received our mandate affirming the false statement conviction). In rejecting the appeal, we concluded:

> The filing of a notice of appeal, although transferring jurisdiction over the case from the district court to the Court of Appeals, does not render the district judge powerless or without jurisdiction to enforce the conditions of a bond under which defendant has been released pending appeal. *The court retains jurisdiction over the person of the defendant at least for the limited purpose of reviewing, altering or amending the conditions under which that court released the defendant....*

*Id.* at 37 (emphasis supplied);[8] *see Bowdach,* 561 F.2d at 1167 ("It is clear from the language of the statute that Congress was cognizant of the fact that the trial judge might be making the decision concerning the defendant's release after the defendant had filed his appeal, and yet Congress still gave to the trial court the power to make these decisions."); *accord Drefke,* 707 F.2d at 984; *Elkins,* 683 F.2d at 145.

■ Here, the district court exercised its discretion—set forth in Rule 46 and 18 U.S.C. § 3143—in allowing Mr. Queen to remain free pending his appeal. As the *Bowdach* court noted, these release and detention statutes permit district courts to determine whether convicted defendants should be released pending their appeal, and under what conditions. 561 F.2d at 1167; *see* 18 U.S.C. § 3141 *et seq.* This comprehensively drafted legislative scheme also authorizes district courts to enforce their judgments with respect to defendants so released. *See* 18 U.S.C. § 3148; *Drefke,* 707 F.2d at 984; *Elkins,* 683 F.2d at 145; *Bowdach,* 561 F.2d at 1167; *Black,* 543 F.2d at 37. When Mr. Queen failed to surrender himself to the authorities—as ordered by the district court—the court had jurisdiction to issue the bench warrant for his arrest.[9]

---

7. Section 3142 of Title 18 of the United States Code merely sets forth the statutory scheme for the release or detention of a defendant pending trial. Subsection (b) states the requirements for a defendant's release on personal recognizance or on an unsecured appearance bond. Subsection (c) sets forth the conditions that a judicial officer may impose under a subsection (b) release.

8. Although our decision in *Black* was rendered prior to the enactment of the Bail Reform Act of 1984, we note that most differences initiated by the new Act are not material to our analysis. The new Act contains a provision, without corresponding language under the old Act, that explicitly provides for revocation of release for violation of a release condition. Thus, the new Act further supports our holding in *Black.*

9. Mr. Queen repeatedly contends that he was mistaken concerning the surrender date and that the government never notified him that he was violating the court's order. However, any argument that the warrant was invalid on this ground is meritless. *See Bowdach,* 561 F.2d at 1166 n. 1 (rejecting argument that bench warrant must be issued only after defendant receives notification from court because "[t]he most likely result of such a procedure would be simply to accelerate that person's plans to evade the federal authorities"). Moreover, at the sentencing hearing on the crimes relating to this appeal, Mr. Queen specifically told the district court that he understood he was to surrender on July 13, 1984, but simply forgot. Tr. of Apr. 20, 1987 at 38.

## B. *Search Incident to Arrest*

Mr. Queen contends that Agent Dolan's search of the closet after his arrest was illegal under the fourth amendment warrant requirement. The government contends that the search was permissible under the search incident to a lawful arrest exception to the warrant requirement, the plain view exception and the exigent circumstances exception.

■ It is well-established that "[s]earches and seizures undertaken without warrants are presumed arbitrary and unreasonable, subject 'to a few specifically established and well-delineated exceptions.'" *United States v. Rivera*, 825 F.2d 152, 156 (7th Cir.) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)), *cert. denied*, — U.S. ——, 108 S.Ct. 494, 98 L.Ed.2d 492 (1987); *accord United States v. Talkington*, 843 F.2d 1041, 1044 (7th Cir.1988). One such exception is a search incident to arrest. *United States v. Graham*, 638 F.2d 1111, 1114 (7th Cir.), *cert. denied*, 450 U.S. 1034, 101 S.Ct. 1748, 68 L.Ed.2d 231 (1981); *United States v. Garcia*, 605 F.2d 349, 352 (7th Cir.1979), *cert. denied*, 446 U.S. 984, 100 S.Ct. 2966, 64 L.Ed.2d 841 (1980); *see United States v. Vasey*, 834 F.2d 782, 785 (9th Cir.1987). As an exception to the warrant requirement, "the scope of such a search has been narrowly drawn and carefully delineated to accommodate only those interests it was created to serve." *Graham*, 638 F.2d at 1114; *see Arkansas v. Sanders*, 442 U.S. 753, 759–60, 99 S.Ct. 2586, 2590–91, 61 L.Ed.2d 235 (1979). The Supreme Court articulated these precise interests in *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). In *Chimel*, the Court held that government agents may conduct a limited search incident to arrest in the immediate area surrounding the arrestee. *Id.* at 763, 89 S.Ct. at 2040. The Supreme Court repeatedly has affirmed the validity of this type of warrantless search, provided that the search was contemporaneous with the arrest, was conducted to prevent seizure of a weapon or destruction of evidence, and was limited to the area within the arrestee's immediate control.[10] In evaluating these factors,

> [a] police officer's determination as to how and where to search the person of a suspect whom he has arrested is necessarily a quick *ad hoc* judgment which the Fourth Amendment does not require to be broken down in each instance into an analysis of each step in the search. The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect.

*United States v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 467, 477, 38 L.Ed.2d 427 (1973).

### 1. Contemporaneous With the Arrest

■ Here, the search of the closet was contemporaneous with the arrest. Indeed, the district court found—based on the testimony of Agent Dolan—that, immediately after Mr. Queen's arrest, Agent Dolan "stepped back into the closet to the area from which he had removed Mr. Queen, and looked around and there was the gun on the floor." Tr. of Apr. 7, 1987 at 111. As the Tenth Circuit recently has observed, "[i]n a suppression hearing, the trial judge's determinations which rest upon credibility and reasonable inferences will not be set aside unless clearly erroneous." *United States v. Skowronski*, 827 F.2d 1414, 1417 (10th Cir.1987). Accordingly, we are required to accept the court's determination. *See id.; United States v. Oglesby*, 764 F.2d 1273, 1278 (7th Cir.1985) (factual findings of district court in ruling on

---

10. *See, e.g., Michigan v. Long*, 463 U.S. 1032, 1048–49, 103 S.Ct. 3469, 3480, 77 L.Ed.2d 1201 (1983) (dicta); *Illinois v. Lafayette*, 462 U.S. 640, 644–45, 103 S.Ct. 2605, 2608–09, 77 L.Ed.2d 65 (1983); *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (dicta); *New York v. Belton*, 453 U.S. 454, 462–63, 101 S.Ct. 2860, 2865, 69 L.Ed.2d 768 (1981); *United States v. Chadwick*, 433 U.S. 1, 14–15, 97 S.Ct. 2476, 2485, 53 L.Ed.2d 538 (1977) (dicta); *United States v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 467, 476, 38 L.Ed.2d 427 (1973).

motion to suppress are subject to clearly erroneous standard of review); *United States v. Streich,* 759 F.2d 579, 585 (7th Cir.) (same), *cert. denied,* 474 U.S. 860, 106 S.Ct. 172, 88 L.Ed.2d 142 (1985).

## 2. Conducted to Prevent Seizure of Weapon

The agents had a lawful bench warrant for Mr. Queen's arrest. The district court found as a fact that the agents knew Mr. Queen was a felon who had not surrendered himself pursuant to a court order. The court also found that the agents were aware that Mr. Queen had carried a handgun in the past and that he might be armed and dangerous. Moreover, when the agents found him in the basement hiding underneath a blanket, Mr. Queen stuck out only one hand; the other appeared only after several commands to stick out both hands, palm-up, into the open. Under these circumstances, the agents' determination that Mr. Queen was probably concealing a weapon was eminently reasonable; they acted pursuant to an understandable concern for their safety. *See Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983). Furthermore, the agents knew that the defendant's stepson was in the house and, therefore, that the presence of a weapon in the closet might have endangered his safety or the safety of others. As the Supreme Court has made clear, "[e]very arrest must be presumed to present a risk of danger to the arresting officer." *Washington v. Chrisman,* 455 U.S. 1, 7, 102 S.Ct. 812, 817, 70 L.Ed.2d 778 (1982); *see United States v. Standridge,* 810 F.2d 1034, 1037 (11th Cir.) (per curiam), *cert. denied,* —— U.S. ——, 107 S.Ct. 2468, 95 L.Ed.2d 877 (1987).

## 3. Limited to Arrestee's Immediate Control

Mr. Queen contends that it was inconceivable that, with his hands handcuffed behind his back, he could have twisted away from two armed agents and have dived past a third to grab the handgun lying on the closet floor. The government, in contrast, contends that Agent Dolan reasonably believed that any weapon on the floor of the closet was within the grabbing range of Mr. Queen. Furthermore, it contends that policemen do not need to presume that, in a stressful situation like the arrest here, the defendant will act in a wholly rational manner.

The District of Columbia Circuit has noted that the area searched for a weapon must be "conceivably accessible to the arrestee—assuming that he was neither 'an acrobat [nor] a Houdini.'" *United States v. Lyons,* 706 F.2d 321, 330 (D.C.Cir.1983) (quoting *United States v. Mapp,* 476 F.2d 67, 80 (2d Cir.1973)).[11] Nevertheless, despite determining that the weapon at issue there was outside of the arrestee's immediate control, the *Lyons* court also noted that "[c]ustodial arrests are often dangerous; the police must act decisively and cannot be expected to make punctilious judgments regarding what is within and what is just beyond the arrestee's grasp. Thus, searches have sometimes been upheld even when hindsight might suggest that the likelihood of the defendant reaching the area in question was slight." *Id.* Indeed, the *Lyons* court cited with approval, *id.* at 330, that circuit's earlier decision in *United States v. Mason,* 523 F.2d 1122, 1125–26 (D.C.Cir.1975), in which it sustained the search of a closet "three or four feet" away from a standing, handcuffed defend-

---

**11.** In *Lyons,* the arrestee was sitting, handcuffed and "immobilized," on a chair "somewhere very close to the door [of the [motel] room], either just inside or just outside," several feet from the area (a closet) where police searched and found a weapon. 706 F.2d at 324. Accordingly, the arrestee was well out of the immediate reach of any weapons concealed in the closet. In addition, six police officers were present at the scene of the arrest and they knew for a fact that the arrestee was alone. Moreover, one officer testified that he was not in fear for his safety and

the purpose of the search merely was to collect the arrestee's property in the room. *Id.* at 325. The situation in *Lyons,* therefore, is markedly in contrast to the circumstances confronted by the agents here. Agent Dolan reasonably believed that Mr. Queen was concealing a weapon under the blanket, and thus feared for his safety. Moreover, Mr. Queen was only a few feet away from the open closet at the time of the search. As a result, *Lyons* is not controlling on the facts of this case.

ant who had attempted to obtain a jacket hanging therein. Moreover, as the Ninth Circuit has cautioned, *"Chimel* does not require the police to presume that an arrestee is wholly rational. Persons under stress may attempt actions which are unlikely to succeed." *United States v. McConney,* 728 F.2d 1195, 1207 (9th Cir.) (en banc) (holding presence of several agents with guns drawn on arrestee "was no guarantee that armed violence could not break out when a loaded gun was only two feet away"), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984); *see United States v. Chadwick,* 433 U.S. 1, 14–15, 97 S.Ct. 2476, 2485, 53 L.Ed.2d 538 (1977) ("The potential dangers lurking in all custodial arrests make warrantless searches of items within the 'immediate control' area reasonable without requiring the arresting officer to calculate the probability that weapons or destructible evidence may be involved."). Indeed, the Supreme Court—as well as several courts of appeals, including our own—have upheld searches incident to arrest where the possibility of an arrestee's grabbing a weapon or accessing evidence was at least as remote as in the situation before us. *See, e.g., New York v. Belton,* 453 U.S. 454, 456, 462–63, 101 S.Ct. 2860, 2865, 69 L.Ed.2d 768 (1981) (arrestees removed from vehicle and separated prior to search of vehicle for narcotics); *United States v. Hatfield,* 815 F.2d 1068, 1071 (6th Cir.1987) (arrestee ordered to stand against wall and guarded by officer while other officer searched vehicle); *Davis v. Robbs,* 794 F.2d 1129, 1130–31 (6th Cir.) (arrestee handcuffed and placed in squad car prior to seizure of rifle in house), *cert. denied,* —— U.S. ——, 107 S.Ct. 592, 93 L.Ed.2d 593 (1986); *United States v. Cotton,* 751 F.2d 1146, 1147–48 (10th Cir.1985) (arrestees handcuffed and apparently guarded by officer while state trooper searched vehicle); *United States v. Silva,* 745 F.2d 840, 847 (4th Cir.1984) (arrestees handcuffed and guarded by federal agents prior to search of room for weapons), *cert. denied,* 470 U.S. 1031, 105 S.Ct. 1404, 84 L.Ed.2d 791 (1985); *United States v. Palumbo,* 735 F.2d 1095, 1096–97 (8th Cir.) (arrestee arguably handcuffed and unarguably surrounded by several officers prior to search of room for narcotics), *cert. denied,* 469 U.S. 934, 105 S.Ct. 332, 83 L.Ed.2d 268 (1984); *United States v. Roper,* 681 F.2d 1354, 1357–59 (11th Cir.1982) (arrestee handcuffed in hallway of motel and escorted inside room by federal agents prior to search of unlocked metal briefcase which uncovered weapon), *cert. denied,* 459 U.S. 1207, 103 S.Ct. 1197, 75 L.Ed.2d 440 (1983); *United States v. Fleming,* 677 F.2d 602, 606–07 (7th Cir.1982) (arrestee handcuffed and removed from immediate area prior to search of luggage); *Virgin Islands v. Rasool,* 657 F.2d 582, 585, 588–89 (3d Cir.1981) (arrestee handcuffed and removed from automobile prior to search of vehicle which uncovered weapon); *United States v. Garcia,* 605 F.2d 349, 352, 354 (7th Cir.1979) (arrestee in custody of several agents when luggage seized and searched), *cert. denied,* 446 U.S. 984, 100 S.Ct. 2966, 64 L.Ed.2d 841 (1980).

Keeping in mind that "a reviewing court, charged with the task of evaluating a *Chimel* search, must first put itself in the position of the law enforcement officers who initiated it," *Fleming,* 677 F.2d at 607, we hold that the discovery of the handgun here was lawful. We should not second-guess the agents' on-the-scene determination. This is especially so where, as here, the agents reasonably could have feared for their safety. This is hardly a situation where "law enforcement officers have reduced ... property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence...." *Chadwick,* 433 U.S. at 15, 97 S.Ct. at 2485. It was not only the agents' right but their duty to seize the lethal weapon lying on the floor where, moments before, they had found the appellant. Accordingly, the district court was correct to admit the handgun into evidence as a product of a lawful search incident to arrest.[12]

12. Because we affirm the judgment of the dis- trict court that the search of the closet was

## Conclusion

Because the district court had jurisdiction to issue the bench warrant for Mr. Queen's arrest, we affirm the decision of the district court to deny the motion to quash his arrest. Similarly, because the FBI agents discovered the revolver pursuant to a lawful search incident to arrest, we affirm the decision of the district court to deny Mr. Queen's motion to suppress that evidence. Accordingly, we affirm the judgment of the district court.

AFFIRMED.

lawful incident to arrest, we decline to analyze the search under either of the other exceptions to the warrant requirement urged by the government—plain view and exigent circum-stances. Although we note that these exceptions are not mutually exclusive, we need not lengthen our opinion by discussing their proper interaction.