2002 D.S.D. 34

**UNITED STATES of America, Plaintiff,**

v.

**James ARCHAMBAULT, a/k/a James Skunk, Defendant.**

**No. CR.00–30089.**

United States District Court, D. South Dakota, Central Division.

Dec. 20, 2002.

See also 206 F.Supp.2d 1010.

---

## MEMORANDUM OPINION AND ORDER

MORENO, United States Magistrate Judge.

### I.

[¶ 1] Before the Court is Defendant, James Archambault, a/k/a James Skunk's (Archambault), Motion for Reconsideration of Release, wherein he seeks a third party custody release to his sister, Kimberly Whiting of Mobridge, South Dakota, while he awaits a decision on his Motion to Dismiss by the Eighth Circuit Court of Appeals. Plaintiff, United States of America (Government), resists Archambault's Reconsideration Motion on jurisdictional grounds and on the merits. For the reasons more fully explained below, Archambault's Release Motion is granted in part and denied in part.

### II.

[¶ 2] Archambault was charged by Indictment on December 14, 2000. The Indictment alleges that on or about October 14, 2000, at Timber Lake, South Dakota and in Indian country, he unlawfully assaulted Marie Dewitt, resulting in serious bodily injury to her. He has pled not guilty to the charge and is currently being detained.

[¶ 3] At his March 26, 2001 initial appearance, Archambault was temporarily detained pending the holding of a detention hearing. He thereafter filed a waiver of the five-day time period for the holding of a detention hearing, *see* 18 U.S.C. § 3142(f)(2). On May 18, 2001, a detention hearing was held at which the Court ordered that Archambault be released on May 29, 2001 for inpatient substance abuse treatment and, upon completion or failure to comply with the same, that he be returned to the custody of the United States Marshal's Service pending the holding of a further hearing on his release status.

[¶ 4] In June, 2001, Archambault filed a Motion to Dismiss the Indictment on double jeopardy grounds. That Motion was later denied by the District Court following lengthy and protracted proceedings. After the Eighth Circuit dismissed his interlocutory appeal, Archambault renewed his Dismissal Motion. The District Court again denied the Motion and Archambault appealed. His appeal has been stayed by the Eighth Circuit pending a decision by the *en banc* Court in *United States v. Lara*, 294 F.3d 1004 (8th Cir.), *reh'g en banc granted*, (8th Cir.2002).

[¶ 5] Believing that a decision on his appeal may be many months away, Archambault moved this Court to reopen the detention issue under § 3142(f)(2) and allow him to be released on a third party custody basis subject to various terms and conditions. The Government contends that the Court lacks jurisdiction to decide the issue while the case is on appeal. Alternatively, the Government maintains that release is not warranted and that Archambault should remain detained.

### III.

[¶ 6] Generally, when an appeal has been taken, a trial court—with limited exceptions—is without authority to take

any adjudicatory action related to the appeal. *United States v. Queen*, 847 F.2d 346, 350 (7th Cir.1988); *United States v. Distasio*, 820 F.2d 20, 23 (1st Cir.1987); *Doyle v. United States*, 721 F.2d 1195, 1197 (9th Cir.1983); *see also Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58, 103 S.Ct. 400, 74 L.Ed.2d 225 (1982) (per curiam). Nevertheless, trial courts do retain limited jurisdiction to make certain post-appeal decisions in criminal cases. *Queen*, 847 F.2d at 350; *United States v. Weber*, No. 95–00125–03–CR–W–8, 1997 WL 61442 at **1–2 (W.D.Mo. 1997); *see also United States v. Katsougrakis*, 715 F.2d 769, 776, n. 7 (2d Cir.1983), *cert. denied*, 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984). One such decision is that a trial court may reconsider its prior bail determination and either alter or amend conditions of release or revoke and/or forfeit a defendant's bond for failure to comply with conditions. *United States v. Black*, 543 F.2d 35, 37 (7th Cir. 1976); *United States v. Ailemen*, 165 F.R.D. 571, 572–601 (N.D.Cal.1996); *United States v. Chen*, 820 F.Supp. 1205, 1207–12 (N.D.Cal.1992); *see also United States v. Krzyske*, 857 F.2d 1089, 1090–92 (6th Cir.), *cert. denied*, 488 U.S. 832, 109 S.Ct. 89, 102 L.Ed.2d 65 (1988); *Queen*, 847 F.2d at 350–51. Because facts may come to light which render it advisable for a trial court to alter release conditions or to revoke bail altogether, the same statute which explicitly authorizes the court to impose conditions upon release pending appeal (i.e. § 3142),implicitly authorizes the court to make such amendments to these conditions as circumstances may necessitate.[1] *Black*, 543 F.2d at 37.

[¶ 7]  Moreover, under § 3142(f), a trial court may reopen the detention hearing "*at any time before trial* if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of [ the] person as required and the safety of any other person in the community" (emphasis added). Archambault has presented information that was not known or available to him at the time of his original detention hearing that is material to and has a substantial bearing on whether he should remain detained.

█ [¶ 8]  In view of the fact that Archambault's pre-trial detention is not an issue before the Eighth Circuit on appeal, and based on applicable case law and the dictates of § 3142 (and in particular subsection (f) thereof), the Court holds that it has jurisdiction to reconsider its prior detention order until a stay or an order to the contrary is entered by either the District or the Appeals Court.

## IV.

[¶ 9]  Aside from the gateway for further review provided by § 3142(f), the Court believes that the detention issue must also be reopened for a more fundamental reason, that being, to examine the due process implications of Archambault's continued detention.

[¶ 10]  In *United States v. Salerno*, 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), the United States Supreme Court held that limited pre-trial detention does not violate due process so long as it is

---

1. It is highly unlikely that Congress, in enacting 18 U.S.C. § 3143(b) and (c), intended to afford a defendant, who has been found guilty of an offense, the right to seek review of his detention status pending an appeal, but did not correspondingly intend to provide a pre-trial defendant (like Archambault) the same right to have his detention status reviewed and, if appropriate, modified.

"regulatory" and "not penal". The *Salerno* Court rejected a facial challenge to the constitutionality of a provision of the Bail Reform Act permitting pre-trial detention based on potential dangerousness, § 3142, ruling that some detention, so premised, would not, by itself, constitute "impermissible punishment" instead of "permissible regulation." 481 U.S. at 747, 107 S.Ct. 2095. The Court, however, observed that it was intimating "no view as to the point at which detention in a particular case might become extensively prolonged, and therefore punitive, in relation to Congress' regulatory goal." *Id.* at 747, n. 4, 107 S.Ct. 2095. By doing so, the Court acknowledged that there could be a point where the length of pre-trial confinement could become excessive "in relation to Congress' regulatory goal."

[¶ 11] Courts have held that prolonged pre-trial detention may become excessive and consequently punitive so as to offend due process constraints. *United States v. Orena,* 986 F.2d 628, 630 (2d Cir.1993); *United States v. Hare,* 873 F.2d 796, 801 (5th Cir.1989); *United States v. Gelfuso,* 838 F.2d 358, 359–60 (9th Cir. 1988); *United States v. Zannino,* 798 F.2d 544, 547 (1st Cir.1986); *United States v. Accetturo,* 783 F.2d 382, 388 (3rd Cir. 1986); *United States v. Theron,* 782 F.2d 1510, 1516 (10th Cir.1986); *see also United States v. Daniels,* No. 98–30040–MAP, 2000 WL 1611124 at **3–6 (D.Mass. Oct.5, 2000); *Ailemen,* 165 F.R.D. at 576–601; *United States v. Estrada,* 86–511–CR–RYSKAMP, 1987 WL 9454 at **1–4 (Jan. 23, 1987). In some cases, due process violations have been found and the defendants ordered released due to their prolonged detention. *See, e.g., United States v. Ojeda Rios,* 846 F.2d 167, 168–69 (2d Cir.1988); *United States v. Gonzales Claudio,* 806 F.2d 334, 341–43 (2d Cir.1986), *cert. denied,* 479 U.S. 978, 107 S.Ct. 562, 93 L.Ed.2d 568 (1986); *Ailemen,* 165 F.R.D. at 572–601; *United States v. Shareef,* 907

F.Supp. 1481, 1482–85 (D.Kan.1995); *Chen,* 820 F.Supp. at 1209–11; *United States v. Gatto,* 750 F.Supp. 664, 672–76 (D.N.J.1990); *United States v. Gallo,* 653 F.Supp. 320, 334–45 (E.D.N.Y.1986). Determinations concerning due process limitations on pre-trial detention require a case-by-case assessment. *Gelfuso,* 838 F.2d at 359; *Daniels,* 2000 WL 1611124 at *4; *Shareef,* 907 F.Supp. at 1484. Length of detention alone is not dispositive and carries no fixed weight in the review process. *Zannino,* 798 F.2d at 548–49.

[¶ 12] The First and Third Circuits have identified two types of criteria to guide courts in the determination of whether due process requires release. First, "due process judgments ... should reflect the factors relevant to the initial detention decision, such as the seriousness of the charges, the strength of the government's proof that defendant poses a risk of flight or danger to the community, and the strength of the government's case on the merits." *Zannino,* 798 F.2d at 547; *Accetturo,* 783 F.2d at 388. Second, "these judgments should reflect such additional factors as the length of the detention that has in fact occurred, the complexity of the case, and whether the strategy of one side or the other has added needlessly to that complexity." *Id.*

[¶ 13] The Second Circuit has held that when considering the due process implications of a prolonged pre-trial detention, a court must consider (1) the length of detention; (2) the extent of the prosecution's responsibility for the delay of trial; and (3) the strength of the evidence upon which the detention was based. *Orena,* 986 F.2d at 630.

[¶ 14] This Court, in its analysis, has combined the criteria and factors articulated by the First, Second and Third Circuits. Along the way, the Court has been mindful that these criteria and factors are not ex-

clusive or a litmus paper test for continued detention or release.

## V.

[¶ 15] Initially, the charge against Archambault is a crime of violence and obviously a serious one. The evidence of record indicates that Archambault, while intoxicated, punched his long time paramour, Dewitt, several times in the face with his fist, resulting in a retinal tear to her right eye, a broken nose, and damage to two of her teeth (that required a root canal to repair). Despite this evidence, the Court allowed Archambault to enter into an inpatient substance abuse facility in May, 2001, where he took and successfully completed the treatment program recommended for him and was discharged. At the time, the Court found that Archambault could safely be released and was prepared to consider re-releasing him on strict terms and conditions if he completed treatment as directed and received a favorable discharge report from the attending facility. It appears that alcohol was an important factor in what transpired between Archambault and Dewitt on October 14, 2000 and has been the root of most of his problems with the law. Archambault, however, has been sober now for almost 21 months and arguably is not as palpably dangerous an individual as he was when he was first charged with and appeared in court on the assault offense.

[¶ 16] As to the second factor, the case against Archambault may not be as strong as the Government maintains if what Archambault asserts is true. Archambault claims that whatever he did to Dewitt did not result in "serious bodily injury" to her. In support of this position, he points to a letter from the treating ophthalmologist who appears to be somewhat equivocal as to whether Dewitt's eye injury (believed to be the most grave of her injuries) was in fact a "serious" one within the meaning of

18 U.S.C. § 113(a)(6). Such evidence, because it goes directly to an element of the charged offense, could have a profound effect on the Government's chances of obtaining a conviction.

[¶ 17] With regard to the strength of the Government's proof that Archambault poses a risk of flight or a danger to the community, it must be remembered that the Court earlier permitted him to be released to attend inpatient treatment and then directed that he be detained because no release plan was presented subsequent to his completion of treatment. The strength of the Government's proof of flight and dangerousness following treatment, therefore, was based in part on his failure or inability to put together a viable community based release plan to present to the Court. Archambault now has tendered a plan to secure both his presence and the safety of the community. Thus, even if the Court were to agree with the Government that Archambault may still be a risk of flight or a danger to the community, a reevaluation is necessary to determine whether there are conditions of release that could reasonably guard against these risks.

## VI.

[¶ 18] The length of Archambault's detention clearly weighs in favor of release. He has been detained for almost 20 months, excluding the one-month time period he spent in treatment. His appeal, which by no means is a frivolous one, will likely delay the disposition of this case many more months. The Speedy Trial Act, 18 U.S.C. § 3161, requires that Archambault be tried within 70 days of his initial appearance. Although it provides for certain excludable periods of time, including delay due to an interlocutory appeal, *see* § 3161(h)(1)(E), the Act was intended to assure that a person is brought

to trial without delay and to minimize the injury he may suffer if he is incarcerated pending trial and subsequently acquitted of the crime charged. The lengthy period of detention, without considering future confinement during appeal, could have a significant effect on Archambault's ability to integrate himself back into society if he is released.

[¶ 19]   This case, at first blush, is not a complex one.   It involves one defendant who is charged with committing a single assault offense on a specific day, 26 months ago.   There are, however, novel questions of fact or law involved in the case that have resulted in a fiercely contested battle over the protections afforded by the Double Jeopardy Clause and an appeal that could easily take many months to resolve.   The indefinite duration of the appeal and Archambault's detention during it weighs heavily in his favor.

[¶ 20]   The Court believes that it is appropriate to consider the potential term of imprisonment which Archambault faces under the Sentencing Guidelines in the event he is ultimately found guilty of the assault charge as compared to the prospective length of pre-trial detention he has already served in determining whether release is warranted under the Due Process Clause or otherwise in this instance. While the Court is certainly in no position to calculate, with any modicum of certainty, the potential prison term Archambault would be subject to under the Guidelines, if convicted, the Court has nonetheless determined that it is possible that Archambault's range may only be 27–33 months.[2] The Court recognizes that Archambault may be subject to a much longer period of incarceration based on facts not presently available but nonetheless believes that fun-

damental fairness dictates that a criminal defendant like Archambault, who is presumed innocent, should not be required to serve a substantial portion of the sentence to which he may be subject to before a determination of guilt has been made.

[¶ 21]   The Court must also consider the extent to which the Government and/or Archambault have been responsible for the delay.   While it is true that the appeal now pending before the Eighth Circuit was taken by Archambault, the issues he seeks a decision on could result in a reversal and even a dismissal of his case.   *Compare United States v. Millan,* 4 F.3d 1038, 1044 (2d Cir.1993) ("very probable" that the denial of the defendant's double jeopardy motion would be affirmed on appeal; accordingly, no nonspeculative basis to anticipate that further delays would occur in the case), *cert. denied,* 511 U.S. 1006, 114 S.Ct. 1375, 128 L.Ed.2d 51 (1994).   In addition, much of the delay on appeal is attributable to *Lara,* a case involving the same double jeopardy issues as Archambault has raised, which is being reviewed now by the Appeals Court *en banc.*   Significantly, it was the Appellate Court, at the behest of the Government, that stayed Archambault's appeal pending a decision in *Lara.* The Court has reviewed the history of this case and finds that neither party has contributed in any material way to the length of Archambault's pre-trial detention.

[¶ 22]   The final factor for consideration is the strength of the evidence of flight/non-appearance and danger.   Consideration of this factor requires the Court to apply the criteria set forth in 18 U.S.C. § 3142(g), which it has done.

---

**2.**   This estimate is based on Archambault having an offense level of 19, a criminal history category of III and him receiving a 3–point deduction in his offense level for acceptance

of responsibility.   If Archambault does not receive any acceptance of responsibility deduction, his sentencing range increases to 37–46 months.

██ [¶ 23] After balancing all applicable factors and criteria, including the length of detention, the gravity of the charge, the evidence against him, the complexity of the case, the reasons for the delay, and the risk of flight/non-appearance and of danger to the community, the Court finds that further detention of Archambault would exceed the permissible limits of due process and would become punitive. The Court now believes that stringent conditions of release, in the form of a community corrections/halfway house placement, with conditions, can reasonably assure his presence at all court related proceedings and properly address the risk he poses to Dewitt and others as well as to the community. While the risks Archambault presents still may be serious, "of at least of equal gravity is the preventative detention for [20] months of [a] defendant[ ] who [is] presumed innocent and whose trial to determine guilt or innocence will not even begin until detention has lasted [for an undetermined number of additional months]." *Daniels*, 2000 WL 1611124 at *6.

## VII.

[¶ 24] In the opinion of the Court, the following conditions, in combination, establish strict control, enforced by significant disincentives, which will reasonably assure that Archambault will not flee or engage in criminal activity (against Dewitt or others) which might, in turn, be a danger to the community:

1. Archambault shall reside at a community corrections facility/halfway house and participate in any and all programs recommended by the staff there or by his Pre–Trial Services Officer or a United States Probation Officer. While at the facility/halfway house, he shall comply with and abide by all of the rules applicable to him. In addition, he shall pay for a portion of his placement at the facility/halfway house, in an amount to be determined by the United States Probation Office.

2. He shall not commit any offense in violation of federal, state or local (including tribal) law while on release.

3. He shall appear at and participate in all case related matters scheduled by his attorney.

4. He shall answer promptly answer all correspondence and return all telephone calls from his attorney and cooperate fully with his attorney so that his attorney is able to properly and efficiently manage the case.

5. He shall appear at and participate in all proceedings as required by a judicial officer of the District of South Dakota and surrender himself for service of any sentence imposed as directed.

6. He shall maintain employment, or if unemployed, actively seek employment as directed by his Pre–Trial Services Officer, or a United States Probation Officer.

7. He shall not leave the District of South Dakota unless authorized to do so by the Court.

8. He shall not have any initiated contact, direct or indirect, with Marie Dewitt.

9. He shall report to the United States Probation Office as directed by his Pre–Trial Services Officer or a United States Probation Officer.

10. He shall not possess a firearm, destructive device or other dangerous weapon.

11. He shall not possess, consume or use an alcoholic beverage or a narcotic drug or other controlled substance, as defined in 21 U.S.C. § 802, without a prescription from a licensed medical practitioner.

12. He shall not enter or remain in any business establishment, residence or private club where alcoholic beverages are served, sold for consumption or consumed.

13. He shall supply a sample of his blood, breath and other bodily fluids or substances upon the request of his Pre–Trial Services Officer, a United States Probation Officer, a counselor or supervisory staff member of the community corrections facility/halfway house where he is placed, or any federal, state or local (including tribal) law enforcement officer.

14. He shall submit to a search and seizure at any time of the day or night of his person, personal possessions and property, real or personal, which he may own or lease, or which he may exercise or have the right to exercise possession or control over whenever requested to do so by his Pre–Trial Services Officer, a United States Probation Officer, his counselor or a supervisory staff member at the community corrections/halfway house where he is placed, or any federal, state, or local (including tribal) law enforcement officer.

15. He shall participate in an aftercare program approved by the Court for the treatment of alcohol/substance abuse and follow any and all recommendations and/or directives made by the treating person or facility.

16. He shall obtain anger control/management counseling and continue with the same under the supervision of his Pre–Trial Services Officer or a United States Probation Officer.

17. He shall not enter or remain within the confines of Timber Lake, South Dakota.

18. He shall notify his Pre–Trial Services Officer or a United States Probation Officer within 24 hours of any arrest on any federal, state, local (including tribal) criminal charge.

19. He shall make arrangements for any and all transportation from the community corrections facility/halfway house for court appearances, meetings with his attorney or otherwise.

20. He shall surrender himself forthwith to the United States Marshal's Service, in Pierre, Rapid City or Sioux Falls, South Dakota, if he fails or refuses to comply with the rules of the community corrections/halfway house and is discharged from the same for one or more rule violations.

### VIII.

[¶ 25] Based on the foregoing, and good cause appearing, and in accordance with § 3142 and the Due Process Clause, it is hereby

[¶ 26] ORDERED that Archambault's Motion for Reconsideration of Release, Docket No. 194, shall be and is GRANTED IN PART AND DENIED IN PART. The Motion is GRANTED to the extent that it seeks to reopen the detention issue and to the extent that it seeks to have Archambault released on conditions. In all other respects, the Motion is DENIED. A separate Order authorizing a community corrections/halfway house release, incorporating the conditions set forth above, has been entered this day. Archambault shall review and sign the Order, acknowledging that he understands the terms and conditions of the same, and may be released once arrangements have been made for him to be placed at and transported to a community corrections facility/halfway house.